LEHIGH CONSTRUCTION COMPANY, A CORPORATION OF THE STATE OF NEW JERSEY, REYNOLDS TERRACE, INC., A CORPORATION OF THE STATE OF NEW JERSEY, AND RAYMOND SALERNO, PLAINTIFFS-RESPONDENTS, v. HOUSING AUTHORITY OF THE CITY OF ORANGE, A BODY CORPORATE AND POLITIC, AND ALBA CONSTRUCTION COMPANY, INC., A CORPORATION OF THE STATE OF NEW JERSEY, DEFENDANTS-APPELLANTS.

Argued May 4, 1970—Decided July 7, 1970.

448

*Mr. William L. Brach* argued the cause for appellant Housing Authority of the City of Orange (*Mr. A. Vincent Gasparine,* attorney; *Messrs. Brach, Eichler, Rosenberg & Silver,* of counsel).

*Mr. John J. Sheehy* argued the cause for appellant Alba Construction Company, Inc. (*Mr. Robert A. Baron,* attorney; *Messrs. Sheehy and Sheehy,* of counsel).

*Mr. William B. Butler* argued the cause for respondents (*Messrs. Hooley, Goldberg, Perselay & Kelly,* attorneys).

The opinion of the court was delivered by
FRANCIS, J. The primary question presented by this appeal is whether *N. J. S. A.* 40:50–1, which requires competitive bidding on contracts for public work where the amount involved exceeds $2500, applies to a low-rent housing project to be developed under the Federal "Turnkey" method established pursuant to 42 *U. S. C. A.* § 1401 *et seq.* (Chapter 8—Low-Rent Housing).

If the New Jersey statute is applicable to the construction project involved here, it would have been necessary for the defendant Authority to publicly advertise for bids on the work and to award the contract to the lowest responsible bidder. Moreover, the invitation to bid would have to relate to specifications that were as definite, precise and full as practicable in view of the character of the work. Also, the specifications would have to constitute the common standard for the bidding so as to enable all bidders to bid intelligently and to afford them a fair and reasonable opportunity for competition. *Fereday & Meyer Co., Inc. v. Elizabeth Board of Public Works,* 27 *N. J.* 218 (1958); *Hillside Tp., Union County v. Sternin,* 25 *N. J.* 317 (1957); *James Petrozello Co., Inc. v. Chatham Tp., 75 N. J. Super.* 173 (App. Div.

1962). Once the invitation had been extended and bids submitted, the municipal authority could not have waived any substantial variance between the specifications stated and a proposal submitted. *William A. Carey & Co. v. Borough of Fair Lawn, Bergen County,* 37 *N. J. Super.* 159 (App. Div. 1955). In the present situation, it is undisputed that no effort was made to comply with *N. J. S. A.* 40 :50–1, as interpreted by the cases, because defendant Authority deemed the statute inapplicable.

The Housing Authority of the City of Orange is an agency created to administer the low-rent housing program of the City. *N. J. S. A.* 55 :14A–1 *et seq.* In 1969, after discussion with the United States Department of Housing and Urban Development (HUD), the Authority decided to undertake a low-rent housing project for its elderly citizens. The project was to consist of 234 dwelling units and was to be developed by the Turnkey method under 42 *U. S. C. A.* § 1401 *et seq.*

The Turnkey method is a program under which a local housing authority contracts for completed housing to be produced by the developer on his own land, or on land on which he has an option, or on land which the authority may provide (obviously at a fair price) out of urban renewal property. Upon completion of construction and the "turning over of the keys" to the authority, payment for the project is made by the authority. Burstein, "New Techniques in Public Housing," 32 *Law & Contemp. Prob.* 528, 529–30 (1967).

The procedure for awarding federally financed Turnkey low-rent housing construction contracts has been established by HUD. It was created under broad rule-making power conferred by 42 *U. S. C. A.* § 1408, and has been set forth in section 221.1 of HUD's publication entitled "Low-Rent Housing Manual." The United States Supreme Court sustained the adoption of the Manual as a proper exercise of HUD's authority and indicated that the regulations contained therein are binding upon local housing authorities.

*Thorpe v. Housing Authority of the City of Durham,* 393 *U. S.* 268, 89 *S. Ct.* 518, 21 *L. Ed.* 2d 474 (1969). It is thus apparent that if such an authority (designated LHA in the Manual) intends to employ the Turnkey method, it must comply with the Manual's requirements. Competitive bidding of the type specified by *N. J. S. A.* 40:50–1 is neither required nor permitted by the Manual, and it seems obvious that, if the strictures of the New Jersey statute are imposed by judicial interpretation, the Turnkey program for low-rent housing will not be available for New Jersey.

In discussing the Turnkey scheme, Joseph Burstein, Esq., Associate General Counsel of HUD, one of the participants in its development, said:

"Although simple in concept, the Turnkey system completely reverses the traditional method of producing public housing-site acquisition by purchase or condemnation, preparation of competitive-bidding type plans and specification by an architect retained by the LHA [Local Housing Authority], competitive bidding and award, and construction by the low bidder." Burstein, *supra,* 32 *Law & Contemp. Prob.* at 530.

See also S. Rep. No. 809, 90th Cong., 1st Sess. 1, 36 (1967); H. R. Rep. No. 1585, 90th Cong., 2d Sess. 27 (1968). The Manual, p. 1, lists 13 steps in the accomplishment of a Turnkey project. They are listed below (with emphasis added) with elaboration where appropriate.

"Except as stated in paragraph 1d below, all of the steps and related procedures set forth in this Section 221.1 shall be taken for each Turnkey project in the order stated. Briefly, these include, following the approval of the LHA's application for a low-rent housing program, the following steps:

I. "*[T]he advertisement by the LHA for Turnkey proposals.*"

The advertisement's specification of the physical characteristics of the proposed development is to be a "general" one. The advertisement should contain:

(1) A statement as to the number of units and rooms, the allocation of them between the elderly and non-elderly, the spaces required for community, management and maintenance areas, parking, outdoor recreation facilities, and type of housing. Manual, p. 3, section 3c(1). There is no requirement for detailed plans and specifications on which bids are to be based, as is required by *N. J. S. A.* 40:50–1.

(2) The direction of attention to HUD requirements and the availability of detailed information at the LHA as to: Davis-Bacon prevailing wage rates, Title VI of the Civil Rights Act and other equal opportunity provisions, site approval, necessity for a Statement of Disclosure of Interest on the part of the developer or builder or both, and necessity for a statement with respect to any opportunities for training and employment to be given to lower income persons residing in the area and as to whether the developer, or any of his subcontractors, are located in or owned in substantial part by persons residing in the area of such housing. Manual, p. 3, section 3c(2)(a)–(e).

(3) A request for copies of a proposal from the developer which should include the following:

(a) rough sketches of the site layout, buildings and unit plans;

(b) a statement as to the zoning for the proposed site and whether it is permissive;

(c) a statement of the developer's or builder's qualifications to undertake the proposed project with efficiency and dispatch, including a brief statement of previous experience in developing similar projects. Section 3c(3)(a)–(e);

(d) a statement of the developer's total Turnkey price itemized as follows: site, site improvements, dwelling construction and equipment (the developer is asked to specify if ranges and refrigerators are to be furnished),

non-dwelling construction, architectural and engineering services, miscellaneous other items.

The price request is for a tentative price. Its primary purpose is to enable LHA and HUD to determine whether the prices are within a reasonable range. Manual, p. 5, section 4b(2). The Manual indicates clearly that this price estimate is intended neither to be final nor to represent the sole factor to be considered in selecting a developer. Manual, p. 6, section 4(e). Here it may be noted that, under 42 *U. S. C. A.* § 1415(5), the cost for accommodations designed specifically for elderly families in the New Jersey area shall not exceed $3500 per room, subject to certain exceptions which in the discretion of HUD may warrant an increase up to $750 per room additional.

II. *"[T]he evaluation of proposals by the LHA and the Regional Housing Assistance Office (HAO)."*

LHA is required to send copies of the proposals received to HAO immediately. The two then evaluate each proposal "on the basis of (a) site — its location, cost and other factors pertinent to the site report, (b) construction — its design and cost, (c) credentials of developer, (d) the developer's and/or builder's Statement of Disclosure of Interest." Manual, p. 4, section 4b(2). This evaluation stage includes the tentative selection of a developer. But the Manual says: "* * * this tentative selection does not indicate that the developer's prices for the site[1] and construction are acceptable, but only that they do not appear to exceed an upper limit for negotiating purposes." Manual, p. 6, section 4e.

III. *"[T]he appraisal of the proposed site."*

---

[1]Site is not a problem in this case since the Authority, responding to HUD's encouragement to use urban renewal land for Turnkey projects, has provided the land, presumably at a fair market price to be fixed. See Manual, p. 12, section 13.

IV. "[*T*]*he Feasibility Conference during which agreement is reached on the project design and the price of the land.*"

The participants in this conference are LHA representatives, the developer, his architect and other associates, and HAO staff. There the parties negotiate the price of the land and discuss project design and HUD requirements, including "planning and design criteria, * * * utility selection, labor regulations and wage rates, statutory cost limits, Title VI of the Civil Rights Act and other equal opportunity requirements, status of the Workable Program for Community Improvement, relocation of site occupants, the preparation of the developer's firm proposal including length of construction time, and data for the LHA's Development Program." Manual, p. 7, section 6a(2).

The Manual adds also:

"Except for the final negotiation of the price of the land * * * and the discussion of price changes to the original proposal resulting from agreed design changes * * *, there will be no negotiations on the total price of improvements at this meeting. Instead, the developer will be advised of the HUD cost estimating requirements and procedures, and that the price that the LHA and HUD will agree to pay for the improvements will be determined following their review of the cost estimates." Manual, p. 7, section 6c.

V. "[*T*]*he developer's preparation of preliminary drawings and outline specifications.*"

VI. "[*I*]*ndependent cost estimates and LHA and HAO evaluation of the proposed price for improvements.*"

VII. "[*T*]*he Negotiation Conference during which a price for the improvements is agreed upon.*"

According to the Manual:
"The primary purpose of the Negotiation Conference is to negotiate a price for the improvements which is reasonable in all of the circumstances. The LHA should assure that the public funds in-

volved are used prudently and effectively, and the HAO will participate for the same purpose. Agreement must be reached on a price which, in the best judgment of the LHA and HAO staff in the exercise of their public responsibilities, represents a prudent and supportable expenditure of Federal funds for the product being provided. In no event shall the total price agreed upon, excluding that for land, be greater than the midpoint of the reconciled cost estimates as determined by the HAO." Manual, p. 9, section 9b.

VIII. "[*T*]*he preparation of the LHA Development Program.*"

IX. "[*T*]*he execution of the Annual Contributions Contract between the LHA and HUD and the Letter of intent by the LHA, the developer, and HUD.*"

X. "[*T*]*he developer's preparation of working drawings and specifications and their review and approval by the LHA and the HAO.*"

XI. "[*T*]*he submittal of such working drawings and specifications for updated cost estimates.*"

XII. "[*T*]*he execution and approval of the Contract of Sale between the developer and the LHA.*"

If, upon further consideration of the matters referred to in step XI, the developer's proposal is acceptable to the LHA and HUD, "the LHA will enter into a Contract of Sale under which the LHA agrees to purchase the completed development. This contract will be backed up by the financial assistance commitment of the United States of America, acting through HUD, to the LHA * * *, and it will enable the developer to secure commercial construction financing in his usual way." Manual, p. 1, section 1a. This commitment assures the availability of the purchase money upon completion of the project and also assures the developer (or his financing institution) that if the LHA should fail to carry out its contract, HUD will take over the rights and

obligations of the LHA and carry out its contract. Manual, Exhibit 1; Burstein, *supra,* 32 *Law & Contemp. Prob.* at 530–31.

## XIII. "[*T*]*he Start of Construction.*"

The above outline, which does not pretend to be an exhaustive explication of the Turnkey method of providing low-rent housing, makes it obvious that the procedure is an alternative to competitive bidding on the basis of already existing plans and specifications. The House Report on the Housing and Urban Development Act of 1968 discussing the subject said:

> "The turnkey method, with its emphasis on the involvement of private enterprise in the production of public housing, has substantially expanded the productive capability of the public housing program. Under this method private developers who own, or have an option to buy land * * * can contract to build housing on the land * * * for eventual sale to a local housing agency. This is the reverse of the standard method under which the housing agency first acquires the property by purchase or eminent domain, has the construction plans and specifications prepared by its own architects, and then has the construction done by general contractors.
>
> Under turnkey, a low-rent project can be constructed in less than half the time traditionally required for public housing. It frees the builder from complicated and cumbersome procedures and stimulates his initative to develop imaginative and well-designed buildings at lower cost." 2 *U. S. Code, Cong. & Admin. News* (90th Cong., 2d Sess. 1968) *p.* 2899.

For a thorough explanation of the Turnkey procedure, see Burstein, *supra,* 32 *Law & Contemp. Prob.* at 529–35.

■ Unlike the competitive bidding process with its award of the contract to the lowest responsible bidder, the primary emphasis of Turnkey is not upon cost. Recognition is given to the thesis that in housing more than any other type of public construction, price should be only one factor and that design and quality should receive prime consideration. Comment, Turnkey Public Housing in Wisconsin, 1969 *Wis. L. Rev.* 231, 237–38. The Congressional decision to sanction

the Turnkey system was a matter of policy adopted after considerable study of the problems of public housing. Undoubtedly, it has its weaknesses deriving from the human factors involved. But the competitive bidding statutes, such as *N. J. S. A.* 40:50–1 and similar statutes in our sister states, have not proved a cure-all for the evils associated with that practice. Undoubtedly, Congress balanced the weaknesses of Turnkey against the potential for collusive bidding and for kindred ills in the competitive bidding process and decided that since Turnkey would speed housing production and promote diversity of design, it was a worthwhile experiment in the area of public housing. Such decisions are for the lawmakers, not for the courts.

In the present case, defendant Authority decided to undertake the low-rent housing project for its elderly citizens by the Turnkey method of obtaining federal financing. Following the procedure laid down by the HUD Manual for selecting a developer, it advertised and received six proposals in reply. One was submitted by plaintiff Lehigh Construction Company and another by defendant Alba Construction Company, Inc. These proposals varied in design and layout of the proposed buildings and in suggested facilities, equipment and accommodations. This was to be expected because the aspiring developers were not relating their proposals to pre-fixed plans and specifications and also because, as indicated above, the HUD Manual placed much emphasis on design and left wide latitude for cost statements within the maximum room cost limitation set out in the Federal Low-Rent Housing Act, 42 *U. S. C. A.* § 1415 (5). Of the six proposals submitted, that of Lehigh Construction Company was the lowest in cost for the type and design of building it proposed. Although Alba Construction Company's proposal was substantially higher, its building design, type of accommodations, facilities and equipment included, and physical layout of the building complex were quite different.

Defendant Authority reviewed the proposals, submitted all six to HAO, as required, and expressed a tentative preference

for three of them in an order named. Alba was listed first. Soon thereafter, the Authority and HAO studied and evaluated all of the proposals in the manner required in step II of the Manual. This review was followed by the tentative selection of Alba as the developer. However, before any of the remaining procedural steps of the Manual were taken, this litigation was instituted.

Plaintiff Lehigh brought this proceeding in lieu of prerogative writ claiming that defendant Authority was bound by *N. J. S. A.* 40:50-1 as interpreted by the cases cited above. Therefore, it charged that competitive bidding was required as well as award of the contract to the lowest responsible bidder. The relief sought was a determination that the selection of Alba as the tentative developer was illegal because violative of our statute and also arbitrary and discriminatory. Additionally, the complaint asked that the Authority be directed to accept the proposal of Lehigh as the lowest responsible bidder.

The Authority moved to dismiss the complaint for failure to state a legal claim or, in the alternative, for summary judgment. The ground therefor was that *N. J. S. A.* 40:50-1 was not applicable to a Federal Turnkey low-rent housing project. The trial court denied the motion, holding that the New Jersey statute controlled and that there were certain factual issues which should be disposed of at a plenary trial. Defendants unsuccessfully applied to the Appellate Division for leave to appeal therefrom. Leave to appeal was then sought in this Court and because of the important public qhestion involved, we set the matter down for argument as if such leave had been granted. In doing so, we indicated that the issue to be presented to us was the applicability of *N. J. S. A.* 40:50-1 and that, in the meantime, trial of the alleged factual issues could proceed on the scheduled date. Before full briefs were submitted to us and final argument had, the hearing in the trial court was concluded. It resulted in a reaffirmance of the view that competitive bidding for the project was required under *N. J. S. A.* 55:14A-7(c), which,

the court said, incorporated *N. J. S. A.* 40:50–1 and made it controlling on the Authority. It held further that the Authority's action in selecting Alba violated *N. J. S. A.* 40:60–26 relating to sale of land not needed for public use to the highest bidder after publicly advertised sale or by private sale under certain circumstances not present here. Finally, it adjudged that the tentative selection of Alba as the developer and the rejection of Lehigh's lowest responsible bid were arbitrary and void. Thereupon we directed that the entire matter, including the final judgment, be presented to us as if leave to appeal had been granted.

The first and foremost question to be decided here is whether competitive bidding, as prescribed by *N. J. S. A.* 40:50–1, is required for Turnkey housing projects as authorized by 42 *U. S. C. A.* § 1401 *et seq.* Plainly, the procedure outlined in the HUD Manual for making a tentative selection of a developer and awarding a contract to it for construction of low-rent housing is not compatible with the procedure prescribed generally by the State statute for contracts for public work.

There are many indications that the Legislature has long been interested in taking advantage of any federal aid, financial or otherwise, which may be available for the benefit of the citizens of our State. That interest has been expressed by authorizing cooperation by the State, its political subdivisions and public agencies, with federal agencies and acceptance by the former of conditions and regulations imposed by the federal agencies as prerequisites to obtaining such aid. For example, *L.* 1938, *c.* 19 (*N. J. S. A.* 55:14A–1 *et seq*), which created local housing authorities included a provision authorizing them:

"To arrange or contract, in the manner now prescribed by law concerning municipalities, except as otherwise provided by the rules or regulations of the United States Housing Authority, for the furnishing by any person or agency, public or private, of services, privileges, works or facilities for, or in connection with, a housing project or the occupants thereof; and (notwithstanding anything to the contrary contained in this chapter or in any other provision of law) to in-

clude in any contract let in connection with a project, stipulations requiring that the contractor and any subcontractors comply with requirements as to minimum wages and maximum hours of labor, and comply with any conditions which the Federal Government may have attached to its financial aid of the project." *L.* 1938, *c.* 19, section 8(c) (now *N. J. S. A.* 55 :14A–7).

In connection with this section of the statute, it is interesting to note that in November 1937, four months before the enactment of *L.* 1938, *c.* 19, the Supreme Court of Pennsylvania, in *Campbell v. School Dist. of Borough of Bellevue, 328 Pa. 197, 195 A.* 53 (1937), had occasion to consider the relation between the competitive bidding statute of its state (which was substantially the same as ours) and a provision of another enactment (similar to our section 8(c) just quoted) authorizing a school board to accept federal grants containing such terms as were necessary to obtain the grant, including stipulations relating to maximum hours and minimum wages. An objection was raised to a proposed school board contract on the ground that it violated the mandate to make the award to the lowest bidder. The objectors showed that acceptance of the federal authority's wages and hours regulation would cause contractors to increase their bids from eight to ten per cent above that normally required for construction.

The court declared that the statute must be liberally construed to effectuate its purpose and that it should be interpreted as modifying the competitive bidding act wherever the former was applicable. The opinion accepted as the controlling principle that, since the statute gave the school board power to secure money from the Federal Government and recognized the existence of federal agencies, the law must have been enacted with knowledge of the federal requirements and with the intention that the competitive bidding provisions should apply subject to the conditions. required by existing federal legislation. See also *Tranter v. Allegheny County Authority,* 316 *Pa.* 65, 173 *A.* 289, 300 (1934).

. Returning to Chapter 19, *L.* 1938, attention is drawn to its section 20 which provided:

"In addition to the powers conferred upon any authority by other provisions of this chapter, an authority is empowered to borrow money or accept contributions; grants or other financial assistance from the Federal Government for or in aid of any housing project within its area of operation, to take over or lease or manage any housing project or undertaking constructed or owned by the Federal Government, and to these ends, to comply with such conditions and enter into such mortgages, trust indentures, leases or agreements as may be necessary, convenient or desirable. *It is the purpose and intent of this chapter to authorize every authority to do any and all things necessary or desirable to secure the financial aid or co-operation of the Federal Government in the undertaking, construction, maintenance or operation of any housing project by such authority.*" *N. J. S. A.* 55:14A-19. (Emphasis added.)

Finally, section 26 of this Act stipulated that if any of its provisions were inconsistent with those of *any other law,* the provisions of the Local Housing Authorities Act "shall be controlling." *N. J. S. A.* 55:14A-26. Section 8(c) of the 1938 statute (now *N. J. S. A.* 55:14A-7) was amended by Chapter 326, *L.* 1950. However, the changes were matters of form and not of substance. The statement attached to this amendment gave further evidence of our Legislature's intention to keep in step with movements on the federal scene. It said the purpose of the amendment was to make our housing act "consistent with the pertinent amendments to the United States housing act of 1937 made by the housing act of 1949."

Thus the cited provisions of the 1938 Act with their broad authorization to accept federal regulations in seeking financial aid are still in existence and entitled to a liberal interpretation by this Court to accomplish the legislative purpose.[2] That Act, as this Court said in *DeVita v. Hous-*

---

[2] Other examples of similar authorization to bow to federal regulations in housing aid matters are *N. J. S. A.* 55:14A-8 concerning tenant eligibility or preference; *N. J. S. A.* 55:14A-29 empowering an authority to convey the housing project to the Federal Government

*ing Authority of City of Paterson,* 17 *N. J.* 350, 352 (1955), was "designed to implement the far-reaching national housing program which contemplated federal loans and subsidies to local housing agencies." The Turnkey program involved here was not in existence in 1938 or 1950. It was proposed in 1967 and the Manual containing the regulatory procedures to be followed by local authorities in awarding contracts to developers for low-rent housing was adopted by HUD in September 1967.

Notwithstanding the Manual's later adoption, we are satisfied that the broad language of *N. J. S. A.* 55:14A–7(c), dating back to 1938, reasonably construed, reveals an intention on the part of the Legislature to sanction an exemption of Turnkey housing construction from the competitive bidding requirements of *N. J. S. A.* 40:50–1. The authorization to the Authority in *N. J. S. A.* 55:14A–7(c) to contract for low-rent housing for the elderly "in the manner now prescribed by law concerning municipalities" obviously refers to bidding under *N. J. S. A.* 40:50–1. But this is followed by the express exception therefrom when the "rules or regulations of the Federal Government" provide otherwise. The implication of relief from the bidding obligations is emphasized by the further statement that "notwithstanding anything to the contrary contained * * * in any other provision of law" an authority may agree to "comply with any conditions with the Federal Government. may have attached to its financial aid of the project." And, considering the language of *N. J. S. A.* 55:14A–19 that "the purpose and intent of this chapter [is] to authorize every authority to do any and all things necessary or desirable to secure the financial aid or co-operation of the Federal Government in the undertaking [and] construction * * * of

in the event of a substantial default; *N. J. S. A.* 55:14A–43 authorizing an authority to borrow money or accept contributions or capital grants from the Federal Government to assist in redevelopment projects, and in connection therewith to do any and all things necessary or desirable to secure such financial aid.

any housing project * * *," the conclusion that competitive bidding on the basis of common plans and specifications is not required is eminently reasonable and entirely consistent with the historical legislative attitude toward public housing. This legislative language is a significant symptom of the New Jersey lawmakers' awareness of federal movement in the area of housing. It is fair to assume that the Turnkey program was not unknown to them, especially since the record shows that it has been utilized already in our State. And, although not of controlling moment, their silence, in the face of the absence of use of the competitive bidding process on such local projects, is some evidence of approval of the superseding federal regulations.

Under the circumstances, we cannot agree with the trial court's judgment that *N. J. S. A.* 40:50–1 is applicable in this case.[3] The same is true as to its incidental view that *N. J. S. A.* 40:60–26 is pertinent and provides some authority in support of the main issue. The provisions of that statute respecting sale of land no longer needed for public use to the highest bidder, in our opinion, are also within the exemption created by *N. J. S. A.* 55:14A–7(c). We do not feel that any extended discussion of that statute is necessary.

This brings us to the portion of the trial court's judgment based upon a finding that the Authority's action in joining with HAO in the tentative selection of Alba as the developer of the project was arbitrary. We have no doubt that such an authority should treat fairly and with due consideration all proposals submitted by aspiring developers in response to the initial advertising step in the Turnkey procedure. There is some indication that, in the initial state of consideration, the Authority was not as liberal or as generous in allowing Lehigh to enlarge upon its proposal by sub-

---

[3]The Superior Court of Massachusetts recently reached the same conclusion in the unreported case of *Alberto v. Lawrence Housing Authority and J. A. Leone Realty and Development Corporation* (Nov. 5, 1969). We have been advised that an appeal therefrom is now pending in the Supreme Court of that state.

mitting a missing "rendering" or artists' conception of its proposed buildings' design as it was with certain revisions of Alba's proposal. However, the evidence adequately reveals that Lehigh's proposal, including the visual conception of the type of construction, was fully presented and considered by the Authority and the agents of HAO before the tentative selection of Alba as the developer was made. Consequently, the record in its totality does not adequately support a finding that the selection of Alba was arbitrary or discriminatory.

Accordingly, the judgment of the Law Division is reversed and the matter is remanded for entry of judgment in favor of the defendants. The restraint imposed by the trial court against further proceedings toward consummation of the housing project is dissolved. No costs.

*For reversal and remandment*—Chief Justice WEINTRAUB and Justices JACOBS, FRANCIS, PROCTOR, HALL, SCHETTINO and HANEMAN—7.

*For affirmance*—None.