152 N.J. Super. 582 (1977)
378 A.2d 266
FLORAL PARK TENANTS ASSOCIATION, PLAINTIFF,
v.
PROJECT HOLDING, INC., A NEW JERSEY CORPORATION, DEFENDANT.
PROJECT HOLDING, INC., A NEW JERSEY CORPORATION, PLAINTIFF, AND ACTION COMMITTEE OF FLORAL PARK, AN UNINCORPORATED ASSOCIATION, LUIS PEREZ, JOHN KRUFT, YOLANDA GONZALEZ, PEDRO ALVAREZ AND CARLOS ARTOLA, APPLICANTS FOR INTERVENTION,
v.
FRANK SMYTH ET AL., DEFENDANTS.
Superior Court of New Jersey, Chancery Division.
Decided July 6, 1977.
*586 Mr. William Goldberg for Floral Park Tenants Association and Frank Smyth et al.
Mr. Laurence B. Orloff for Project Holding, Inc. (Messrs. Orloff, Lowenbach, Stifelman & Siegal, attorneys).
Mr. Arthur N. D'Italia for Action Committee of Floral Park, Luis Perez, John Kruft, Yolanda Gonzalez, Pedro Alvarez and Carlos Artola (Messrs. Chasan, Leyner, Holland & Tarrant, attorneys).
*587 KENTZ, J.S.C.
Floral Park Tenants Association (Tenants Association), consisting of the tenants presently residing in Floral Park Gardens (Floral Park),[1] filed a verified complaint and order to show cause with this court wherein the Tenants Association sought, among other things, to enjoin and restrain defendant Project Holding, Inc. (Project Holding), landlord and owner of Floral Park, from interfering with the tenants' beneficial right to use and enjoy these premises. Project Holding commenced an action by way of a complaint and an order to show cause in the Law Division seeking a declaratory judgment that members of the Tenants Association who are presently residing in Floral Park must temporarily vacate the premises during a period of substantial renovation and that N.J.S.A. 2A:18-61.1 et seq. (the Anti-Eviction Act) does not bar such temporary vacation. Subsequently, the Law Division action was transferred to the Chancery Division and consolidated with the Floral Park tenants' action.
Before both actions were heard by this court, leave to intervene as a plaintiff was granted to the Action Committee of Floral Park (Action Committee), consisting of tenants who have already temporarily vacated Floral Park and are awaiting to move back as soon as said premises are renovated by Project Holding.
The matter now before the court arises on cross-motions for summary judgment filed respectively by Project Holding and the Tenants Association. Project Holding sets forth several alternate legal theories for a judgment directing the tenants to vacate Floral Park temporarily or a judgment for possession. The Tenants Association contends that the Anti-Eviction Act bars this relief and that a judgment should be entered in its favor.
The undisputed facts are as follows. Project Holding is the record owner of Floral Park. The Tenants Association *588 presently includes the remaining tenants in ten buildings on the premises, being approximately 70 families in number. Project Holding is affiliated with a group known as Applied Housing Associates (Applied Housing) which specializes in urban housing rehabilitation. Project Holding, through Applied Housing, submitted to the Department of Housing and Urban Development (HUD) a "Feasibility Application" and preliminary proposals for rehabilitation of the subject buildings. The plan was approved by HUD. It provides for those of low and moderate income to receive rental assistance to meet the higher rent resulting from rehabilitation and proper operations. HUD did agree to insure a mortgage loan to the owner from a HUD-approved mortgagee. The approved plan permits the tenants to return to the premises after relocation whether the new federally controlled rent is paid entirely by them or partly by rental assistance. Additionally, municipal approval was granted in the form of a resolution of the Township of North Bergen declaring the subject premises blighted and in need of redevelopment.
As early as June 1976 Applied Housing, on behalf of Project Holding, commenced a program of notification and education of the Floral Park tenants looking towards the goal of temporary relocation, essentially at Project Holding's expense, and an ultimate opportunity to move back into the project after the completion of the rehabilitation work. Project Holding offered reimbursement for moving expenses to decent comparable housing and a relocation benefit of $40 a month for any rent differential plus reimbursement for moving expenses back to the subject premises for those tenants who chose to return.
A substantial number of tenants agreed to and did in fact relocate, temporarily or otherwise. Only 75 of the 374 units are still occupied. The remainder of the units have been vacated by the tenants voluntarily. Five of these remaining families have agreed to vacate the premises voluntarily in *589 the next few weeks. Accordingly, only some 70 families make up the Tenants Association which is blocking Project Holding from effecting the HUD-approved plan for rehabilitation of the premises. The remaining tenants are scattered throughout the many structures and in some instances as few as 10% of the apartments in a building are occupied.
The uncontroverted affidavits submitted by Project Holding indicate that years of neglect by prior ownership have left the buildings in a condition where only substantial demolition and renovation work can restore the structures to the status of attractive and desirable living quarters. Some of the units will be gutted and redesigned apartments will be created from the skeletal structure. There will be three and four-bedroom apartments to accommodate the larger families who are presently residing in units having no more than two bedrooms. It appears that this essential and contemplated major rehabilitation work can not reasonably be done with the tenants or their belongings remaining on the premises.
The pleadings and affidavits filed indicate that there is no genuine issue of material fact. Therefore, this matter is ripe for summary judgment. Judson v. Peoples Bank & Trust Co. of Westfield, 17 N.J. 67 (1954).
The court, in determining whether the remaining tenants should be ordered to vacate the premises temporarily, is faced with the apparent conflict between two important state policies. On the one hand, there exists the social legislation embodied in the Anti-Eviction Act aimed at protecting tenants and their right to housing against unreasonable and arbitrary eviction. On the other hand, there exists the public policy underlying numerous state and federal statutes aimed at promoting and expediting low and moderate-income housing because of its critical shortage. It is this latter policy which Project Holding is seeking to further by the HUD-approved project of rehabilitating the Floral Park *590 complex.[2] The Tenants Association seeks to interpose a strict interpretation of the Anti-Eviction Act to prevent the temporary relocation of the tenants from their present apartments and thus effectively defeat this project. The threshold question is whether these two facially conflicting state policies are reconcilable.
Project Holding has placed the constitutionality of the Anti-Eviction Act in issue. However, it is a well established principle of constitutional adjudication that the court should not reach the constitutionality of any statute unless absolutely imperative in the disposition of the litigation. Ahto v. Weaver, 39 N.J. 418, 428 (1963). Ever mindful of this principle, the court is of the opinion that under the unique circumstances of the instant action the policy of promoting low and moderate-income housing can be reconciled with the policy of preventing unreasonable and arbitrary evictions within the perimeter of the Anti-Eviction Act.
A reading of the Anti-Eviction Act, is legislative history and the cases interpreting it indicate that this act was never intended and should not be interpreted to prevent the temporary relocation of tenants so that the rehabilitation of a low and moderate income housing project might be completed. The Anti-Eviction Act states that no tenant shall be evicted from his apartment except upon the establishment of one of the 18 separate grounds set forth in the statute. N.J.S.A. 2A:18-61.1. The Legislature's statement of purpose attached to this statute indicates that the purpose for this enactment was to prevent "arbitrary" and "unfair" ousters of residential tenants at a time when the Legislature determined there to be a critical shortage of *591 rental housing.[3] Obviously, the purpose of the Anti-Eviction Act was not to eliminate evictions but to limit them to reasonable grounds. See Bradley v. Rapp, 132 N.J. Super. 429 (App. Div. 1975).
Implicit in the enactment of the Anti-Eviction Act was a determination that a housing emergency existed in the State, Gardens v. Passaic, 130 N.J. Super. 369 (Law Div. 1974), aff'd 141 N.J. Super. 436 (App. Div. 1976), especially in the low and moderate-income housing areas. Southern Burlington Cty. N.A.A.C.P. v. Mt. Laurel Tp., 67 N.J. 151, 158-159 (1975). The court in Sabato v. Sabato, 135 N.J. Super. 158 (Law Div. 1975), emphasized the shortage of housing as the motivating force behind the enactment of the Anti-Eviction Act when it said:
Thus the statute ostensibly was to serve the purpose of protecting tenants by limiting the causes for which they may be evicted and be forced to find new quarters in a market critically short of rental housing. [at 164]
Since the Anti-Eviction Act is in derogation of a landlord's common law rights of ownership, it must be strictly construed. Dacunzo v. Edgye, 19 N.J. 443, 451 (1955); State v. Mercer Cty. Common Pleas Ct., 1 N.J. 14 (1948); 25 Fairmount Ave., Inc. v. Stockton, 130 N.J. Super. 276 (Cty. D. Ct. 1974). Consequently, in construing the meaning *592 of this act and particularly the words "eviction" and "removal" which appear in its prohibitive sections, the strictest and most limited meaning which will not defeat the Legislature's obvious purpose must be applied.
The courts in this State have defined "eviction" as "an act of a permanent character done by the landlord in order to deprive, and which had the effect of depriving, the tenant of the use of the thing demised, or of a part of it." (Emphasis supplied; citations omitted). Abbott v. Vico, 24 N.J. Super. 10, 16 (App. Div. 1952); Meeker v. Spalsbury, 66 N.J.L. 60 (Sup. Ct. 1901). The word "remove" is defined in Webster's New International Dictionary as "to change or shift the location, position, station, or residence of (as in order to reestablish)." "Removal" connotes something more than a mere change of location, some reestablishment or a permanent change is suggested. See P.R. Smith Motor Sales v. Lay, 173 Va. 117, 3 S.E.2d 190, 191 (Sup. Ct. App. 1939). Thus, the words "eviction" and "removal" denote a deprivation or transfer of a permanent nature. From these definitions it is apparent that the use of these terms in the Anti-Eviction Act must be construed to mean permanent removal which would force the tenant to seek new housing. Such an interpretation would be entirely consistent with the Legislature's stated purpose to prevent the arbitrary ouster of tenants where they are forced to find new quarters and would not defeat the protection intended for the tenants by the Legislature.[4]
*593 Since the Anti-Eviction Act deals with the permanent removal of tenants, the precise situation before this court is not dealt with therein. In fact, the statute was not intended to and does not apply to the instant case where temporary relocation of tenants is necessary to perform certain rehabilitation work which is brought about by a HUD-approved project. The record indicates that it will take four to six months to complete this work. Inasmuch as the tenants will only be relocated for a relatively short period and will have the opportunity to return to Floral Park after the completion of the renovations, it certainly cannot be said that these tenants are being arbitrarily, unfairly and permanently evicted or removed within the meaning of the Anti-Eviction Act.
The remaining Floral Park tenants are not being subjected to the ills which the statute was intended to remedy. They are not being permanently removed and forced to find new housing which is in short supply. They are being offered equivalent substitute housing for the period it takes to renovate the buildings. Moving expenses will be provided by Project Holding. The tenants are being offered a written commitment by Project Holding to make available to them upon completion of the rehabilitation work a comparable or superior apartment unit within the Floral Park complex at the then prevailing rentals established by HUD and consistent with the applicable federal rules and regulations. Additionally, Project Holding is offering to reimburse the tenants for their moving expenses back to Floral Park.
The Tenants Association argues that the temporary relocation of the tenants is an eviction and a permanent removal because the tenants will not be returning to the same rental unit and under the same rental terms. The tenants contend that if they are temporarily relocated their possessory interest in the actual apartment which they now occupy will be terminated and the present landlord-tenant relationship will also be ended. Admittedly, rehabilitation *594 of the buildings will result in redesigned and newly constructed larger apartments with new configurations having no resemblance to the units as they presently exist. However, this change is a much needed improvement and is in the best interest of the majority of people presently living in Floral Park since many of the tenants have been living in overcrowded conditions and have required larger apartments. It will also further the interest of the state in providing decent housing for larger moderate income families. In light of the interests that are being promoted by a completely rehabilitated project as required by HUD, this court will not be engaged in drawing scholastic distinctions that go to form rather than substance. This court must be governed by the "common sense of the situation" rather than "scholastic strictness." Bradley, supra, 132 N.J. Super. at 433.
If this court were to interpret the Anti-Eviction Act and the use of the terms "eviction" and "removal" with the strictness which the tenants suggest, the court would be attributing a meaning directly in conflict with the purpose of this legislation. The intent of the statute is to provide a form of protection to a tenant from the problems created by a critical housing shortage. It is not to guarantee that tenants can unreasonably insist that the apartments which they occupy remain for all times in the physical condition in which they were originally acquired. The landlord cannot be deprived of the right to modernize and rehabilitate his property even if that encompasses a restructuring of the premises as long as the tenant's interest in retaining substantially comparable housing is protected. In the instant action the tenant's possessory interest is protected by Project Holding's written commitment to permit the tenants to return to the complex after the rehabilitation. The landlord-tenant relationship is not terminated during the period of temporary relocation because the individual tenant retains constructive possession of an apartment unit while the landlord has actual possession. *595 Upon the completion of the project, the tenant divests the landlord of actual possession by exercising his option to return.
Similarly, the fact that the tenants returning to Floral Park will have to bear a new rental price does not mean that the old landlord-tenant relationship is terminated or that the tenants are evicted permanently. Looking at the common sense of the situation, the landlord cannot be required to provide renovated and upgraded housing at the same rental at which he formerly provided the outdated and dilapidated housing. Operational economics in providing better housing with improved essential services dictate that the landlord must charge higher rentals. The tenants here are protected adequately against unreasonable rents by the fact that HUD sets the guidelines for the rents to be charged and also by the fact that many of the tenants will be eligible for rent subsidies from the Federal Government. In the long run many of the tenants will be paying the same rentals which they are presently being charged. Should there be any increase in rentals which a tenant will have to bear directly, it cannot be said that this in itself terminates the old landlord-tenant relationship since increases in rentals are common to an ongoing landlord-tenant relationship. Furthermore, any hardship resulting from a rental increase will affect only a relatively few tenants. This certainly should not be allowed to destroy the whole rehabilitation project and deprive many tenants of the benefits and advantages of the program.
In construing a statute primary regard must be given to its fundamental purpose. Where a literal reading will lead to a result not in accord with the purpose, the spirit of the law controls the letter. N.J. Builders, Owners & Managers Ass'n v. Blair, 60 N.J. 330, 338 (1972). See Union Cty. Bd. of Freeholders v. Union Cty. Park Comm'n, 41 N.J. 333 (1964); San-Lan Builders, Inc. v. Boxendale, 28 N.J. 148 (1958). If the Anti-Eviction Act were held to be applicable under the present set of facts a *596 manifest injustice would result not only to Project Holding and to the member tenants of the Action Committee but also to the general public who would benefit from the completion of this HUD project. This situation was obviously not contemplated by the Legislature and the court has an obligation not to apply literally a statute contrary to its intended purpose. N.J. Builders, Owners & Managers Ass'n v. Blair, supra 60 N.J. at 340; Alexander v. N.J. Power & Light Co., 21 N.J. 373, 378 (1956); Wright v. Vogt, 7 N.J. 1, 6 (1951).
The instant case presents to the court the same type of issue which the court faced in Bradley, supra. The court there construed the Anti-Eviction Act to permit an owner of a two-family house to oust one of the two tenants occupying the two apartments despite the fact that a literal reading of the statute would have prevented the eviction. In excluding plaintiff from the proscriptions of the statute, the court noted there that the act proposes to limit evictions to "reasonable grounds" and that the Legislature cannot reasonably be deemed to have intended that a purchaser such as plaintiff be precluded from evicting a tenant except upon one of the grounds set forth in the statute. If the statute were literally applied the court found that the result would "simply not [be] consonant with equity or reason and we should reach the result probably intended by the draftsman had he anticipated the situation at hand." Bradley, supra 132 N.J. Super. at 434.
As in Bradley, if this court were to determine that the Anti-Eviction Act is applicable to situations other than permanent evictions or removals, then the court would reach a very absurd and anomalous result. If literally applied, a small group of tenants, here 70 out of 374, would be able to prevent the establishment of a much needed low and moderate income housing project. Other tenants like those of the intervenor Action Committee who are hopeful of moving back to a new apartment unit and the public at *597 large would be deprived of a very real improvement to their lives.
The Floral Park tenants argue that Bradley is inapplicable here because, unlike in Bradley, the present situation is covered by N.J.S.A. 2A:-18-61.1(g) (2) and therefore Project Holding should proceed according to this provision and its accompanying notice provision, N.J.S.A. 2A:18-61.2(C), as well as the provisions of the Relocation Assistance Act (N.J.S.A. 52:31B-1 et seq.) and the relocation benefits under N.J.S.A. 20:4-1 et seq.
This argument by the tenants can be disposed of readily. N.J.S.A. 2A:18-61.1(g) (2) provides that the landlord may evict tenants in seeking "to comply with local or State housing inspectors who have cited him for substantial violations affecting the health and safety of tenants and it is unfeasible to so comply without removing the tenant * * *." This section is inapplicable to the instant action because there is no evidence that Project Holding has been cited for housing code violations or that the conditions are such as to warrant a citation. Consequently, what the tenants in effect are urging upon this court is the acknowledgement that the landlord under the Anti-Eviction Act does not have a right to salvage or rehabilitate his property short of it being in violation of local housing codes. The result of this argument would mean that a landlord would have to allow his property to deteriorate to the point where it substantially endangers the health and safety of tenants before he can hope to remove the occupants to rehabilitate the property. Such a construction of the statute would lead to the same anomalous result as would a holding that the Anti-Eviction Act is applicable to situations other than permanent evictions. It would fly in the face of the ultimate goal of the statute to provide adequate housing and the public policy of this state to insure that there be adequate, safe and sanitary housing.[5]
*598 If the court were to apply literally the provisions of the Anti-Eviction Act and bar the relief which Project Holding seeks, it would be compelled to rule that the literal application of the act impedes federal policies of housing rehabilitation as set forth in 42 U.S.C.A. § 5301 et seq. and the regulations issued by HUD in 24 C.F.R. § 1 et seq. The court would then be obliged to hold that the Supremacy Clause of the United States Constitution rendered the act inapplicable to the instant case because of preemption.
The most recent test of whether a Supremacy Clause violation has occurred has been stated by the United States Supreme Court in Jones v. The Rath Packing Co., 430 U.S. 519, 97 S.Ct. 1305, 51 L.Ed.2d 604 (1977) as follows:
Our task is "to determine whether under the circumstances of this particular case [the state's] law stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Hines v. Davidowitz, 312 U.S. 52, 67, 61 S.Ct. 399, 404, 85 L.Ed. 581 (1940). Accord, De Canas v. Bica, 424 U.S. 351, 363, 96 S.Ct. 933, 940, 47 L.Ed.2d 43 (1976); Perez v. Campbell, 402 U.S. 637, 649, 91 S.Ct. 1704, 1711, 29 L.Ed.2d 233 (1971); Florida Lime & Avocado Growers, Inc. v. Paul, supra, 373 U.S. [132] at 141, 83 S.Ct. [1210, at 1217], 10 L.Ed.2d 248; id., at 165, 83 S.Ct. [1210 at 1229]; 10 L.Ed.2d 248 (White, J., dissenting). This inquiry requires us to consider the relationship between state and federal laws as they are interpreted and applied, not merely as they are written. [Citations omitted and emphasis supplied]
Where, as in the present case, the literal application of the state law, i.e., the Anti-Eviction Act, may impose an obstacle to fulfilling the purpose and objectives of the federal act, there is created a conflict which is in violation of the Supremacy Clause.
In applying the test of Jones, supra, this court must focus its attention not necessarily upon the purpose for which the Anti-Eviction Act was enacted but upon the effect that the application of the act would have upon the *599 HUD programs of the type engaged in by Project Holding. Grimes v. Hoschler, 12 Cal.3d 305, 115 Cal. Rptr. 625, 525 P.2d 65 (Sup. Ct. 1974). See also, Perez v. Campbell, 402 U.S. 637, 651-652, 91 S.Ct. 1704, 29 L.Ed.2d 233 (1971), where the court overruled two cases which had considered the purpose of state legislation rather than its effect. If the Anti-Eviction Act did bar the temporary relocation of the tenants, the only way in which Project Holding could implement the HUD-approved rehabilitation project would be to pay the exorbitant demands of a tenant as the price for temporary relocation. It appears from the record that some tenants are seeking from Project Holding $5,000 a family as the price for temporary relocation. Conceivably, one or more of the individual tenants would not be willing to relocate no matter how much money was offered. Therefore, Project Holding and HUD would be completely at the mercy of the tenants with each individual tenant possessing a veto-like power over the ability of the rehabilitation project to proceed apace. The possibility of extortion inherent in this state of affairs is apparent. Moreover, even if Project Holding did eventually succeed in persuading every holdover tenant to leave, the result would only be considerable delay in completing the rehabilitation and a substantial increase in cost.
Where delay and higher costs resulting from the enforcement of a state statute affect the implementation of federal programs, they give rise to a violation of the Supremacy Clause. Marino v. Town of Ramapo, 68 Misc.2d 44, 326 N.Y.S.2d 162 (Sup. Ct. 1971). In Marino the court held that where both delay and higher costs could be expected to accrue if the state competitive bidding statutes were followed, the state statutory scheme was incompatible with the HUD-sponsored low income housing project using a different bidding method and had to yield to federal policy. See also, Lehigh Const. Co. v. Orange Housing Auth., 56 N.J. 447 (1970).
*600 In summary, the literal application of the Anti-Eviction Act as urged by the Tenants Association would clearly be an obstacle to the purpose and objectives of the federal legislation creating the HUD programs. Under the Supremacy Clause of the United States Constitution, the Anti-Eviction Act would have to fall because its literal application would impede a HUD rehabilitation project.
For the foregoing reasons, summary judgment is granted in favor of Project Holding. The Tenants Association's motion for summary judgment is denied.
NOTES
[1] Floral Park Gardens consists of 13 separate buildings containing some 374 apartment units in North Bergen.
[2] The federal policies supporting the efforts of Project Holding are included in the Housing and Community Development Act of 1974, 42 U.S.C.A. 5301 et seq., which act authorizes the project in question. The state statutes and policy declaration can be found in N.J.S.A. 17:15-4 et seq., N.J.S.A. 55:14A-1 et seq., N.J.S.A. 52:27D-142 et seq., and N.J.S.A. 52:27D-152 et seq.
[3] The statement of the purpose of the Anti-Eviction Act as appended to Assembly Bill 1586, L. 1974, c. 49, § 2 which was not included in the New Jersey Statutes Annotated reads as follows:

At present, there are no limitations imposed by statute upon the reasons a landlord may utilize to evict a tenant. As a result, residential tenants frequently have been unfairly and arbitrarily ousted from housing quarters in which they have been comfortable and where they have not caused any problems. This is a serious matter, particularly now that there is a critical shortage of rental housing space in New Jersey. This act shall limit the eviction of tenants by landlords to reasonable grounds and provide that suitable notice shall be given to tenants when an action is instituted by the landlord.
[4] See Mayo v. Boston Rent Control Adm'n, 365 Mass. 575, 314 N.E.2d 118 (Mass. Sup. Jud. Ct. 1974), wherein it was held that where the eviction and renovation by the landlord in a private undertaking had the effect of permanently driving low and moderate income tenants out of their homes to be replaced by tenants who could afford the higher rental to be charged after the renovation and thereby forcing tenants to find new permanent housing without any assistance, such evictions would not be consistent with the purposes and provisions of the Massachusetts Anti-Eviction Act.
[5] See N.J. Mortgage Finance Agency v. McCrane, 56 N.J. 414, 421-422 (1970), for a discussion of the shortage of adequate, safe and sanitary housing which the court therein held to justify the Mortgage Finance Agency Law.