Robert FLETCHER et al., Plaintiffs,

v.

George ROMNEY, Secretary of Housing and Urban Development, S. William Green, Regional Administrator for Housing Assistance, Region I, Housing and Urban Development, Thomas A. Burns, Acting Assistant Regional Administrator for Housing Assistance, Region I, Housing and Urban Development, United States Department of Housing and Urban Development, Town of Ramapo, Town of Ramapo Housing Authority, Defendants.

No. 70 Civ. 3238.

United States District Court,
S. D. New York.

March 1, 1971.

Brent, Dranoff, Phillips & Savad, Nanuet, N. Y., for plaintiffs; Raymond G. Kruse, Maurice Phillips, Nanuet, N. Y., of counsel.

Whitney North Seymour, Jr.. U. S. Atty., S.D.N.Y., for the United States; Richard S. Toder, Yale L. Rosenberg, Asst. U. S. Attys., of counsel.

J. Martin Cornell, New City, N. Y., for defendants Town of Ramapo and Town of Ramapo Housing Authority; Myron Mandel, New City, N. Y., of counsel.

Anne L. Glickman, New City, N. Y., for defendants intervenors Mulligan, Fredericks, Johnson and De Groat; Isabel Becker, New City, N. Y., of counsel.

Alexander Teitler, Nanuet, N. Y., for defendant intervenor Fairway Park, Inc.

Granik, Garson, Silverman & Nowicki, New City, N. Y., for defendant intervenor National Modular Systems, Inc.; David Silverman, New City, N. Y., of counsel.

WYATT, District Judge.

This is a motion by plaintiffs for a preliminary injunction (Fed.R.Civ.P. 65) restraining the commitment or disbursement of moneys for multiple dwelling units in the Town of Ramapo. After hearing and the taking of evidence, the motion must be denied.

Plaintiffs are a large number of citizens living in unincorporated areas of the Town of Ramapo, Rockland County, New York.

Defendants fall into two groupings, federal and state. The federal group consists of several officials of the Department of Housing and Urban Development (42 U.S.C. § 3532; "HUD") and HUD itself. The state group consists of the Town of Ramapo ("the Town") and the Town of Ramapo Housing Authority ("the Authority"). A "town" in New York law is a municipal corporation created by the state legislature as an administrative subdivision of the state. The Town of Ramapo appears to have been created by the legislature in 1829. Revised Statutes, 1829, volume III, pp. 27, 28. By action of local inhabitants, villages may be incorporated under the applicable New York Statutes. Village Law, McKinney's Consol. Laws, c. 64, § 3–300 and following. There are six incorporated villages within the Town of Ramapo. There are "cities" in New York, apparently created by special act of the legislature, but there are no cities in the Town of Ramapo (or in Rockland County). The Town of Ramapo Housing Authority was created by the state legislature, effective March 14, 1967. Public Housing Law, McKinney's Consol. Laws, c. 44–A, § 499.

The Authority has made contracts to acquire and operate two low-rent hous-

ing projects in unincorporated areas of the Town. One such project, which may be called "Airmont", is to be in the easterly part of the Town on a site on South Airmont Road near its intersection with state road 59. The other project, which may be called "Hillcrest", is to be in the westerly part of the Town near the intersection of Hempstead Road and Eckerson Road, north of the Village of Spring Valley.

Under the United States Housing Act of 1937, as amended (42 U.S.C. § 1401 and following), defendant HUD has contracted to make loans or contributions or both to aid the Airmont and Hillcrest projects. It is difficult to spell out in detail the precise kinds of financial assistance to be made by HUD and it is not necessary to do so for purposes of decision.

The Town has about 60 square miles, of which some 12 are in the Palisades Interstate Park, which means that these 12 acres will never be inhabited. The unincorporated areas of the Town, and to some extent the incorporated villages, have predominantly one family detached residential dwellings, with considerable open space.

Plaintiffs are residents of the unincorporated areas who understandably wish to preserve the present character of the land and to prevent the higher population density which the Airmont and Hillcrest projects will to some extent produce. There is no basis, however, on which this court can act to stop the projects.

The suit was commenced on July 29, 1970. The complaint is not "a short and plain statement of the claim" (Fed.R. Civ.P. 8(a)). From its lengthy averments of one count, it appears to be the position of plaintiffs that construction of the two projects violates "the constitutionally protected rights of the plaintiffs", because:

(1) although the Town has agreed with the Authority that there will be "elimination" etc. of "unsafe or insanitary dwelling units", as required by 42 U.S.C. § 1410(a), there "can be no compliance with that portion of the statute";

(2) the projects violate the master plan of the Town;

(3) a June 1, 1970 amendment to the zoning ordinance of the Town was in violation of the master plan and discriminated against private enterprise;

(4) the zoning ordinance amendment dealt with "senior citizen public housing developments" whereas the projects will house 50% who will not be "senior citizens";

(5) the projects violate New York Public Housing Law § 150 in that the Town Board did not approve them by a ¾ vote;

(6) there is no "need" for the projects and "need" is required by federal and state law;

(7) the applications for special permits are required by the zoning ordinance to be made by the Authority but were not so made; and

(8) the "community" was not informed of "the nature of the project".

The state defendants answered in October 1970; the federal defendants have not answered.

The action purports to be a class action. Plaintiffs moved for a determination that it may be maintained as a class action (Fed.R.Civ.P. 23(c) (1)). By order with memorandum opinion, filed December 1, 1970, Judge Lasker denied the motion for the want of an adequate showing, without prejudice to renewal.

The present motion was brought on by order to show cause made by Judge Bryan on February 3, 1971. There was a hearing and evidence was taken on February 12, 1971. On the same day, the following were (on stipulation) by order permitted to intervene as defendants and in opposition to the relief sought by plaintiffs: National Modular Systems, Inc. ("Modular"), contractor for the Airmont project; Fairway Park, Inc. ("Park"), contractor for the Hill-

crest project; and Charles Mulligan and others, individually and as a class of "the elderly and the poor", the "potential beneficiaries of housing".

The factual background appears without any substantial dispute.

The Town has had for many years a zoning ordinance, adopted by the Town Board and applicable to the unincorporated areas only. Town Law, McKinney's Consol. Laws, c. 62, § 261

In early 1966, a change was made in the zoning ordinance which thereafter prohibited apartment buildings.

The Town has a Planning Board. Town Law § 271

In July 1966, it is said that a "master plan" was prepared. Town Law § 272–a In evidence is a so-called "development plan" of that date which gives extensive background material but which does not appear to deal with the future; it is probably only part of the "master plan".

Beginning in 1966, consideration was given by town officials to the need of the Town for low-rent housing for elderly people. These have a special problem in that their income, usually pensions or social security payments or the like, are fixed and low and do not increase with rising prices. The Act recognizes this special problem of "elderly families". 42 U.S.C. § 1402(2) "Elderly" is defined in the Act to include those at "the age at which an individual may elect to receive an old age benefit under title II of the Social Security Act". 42 U.S.C. § 1402(2) In the jungle of the Social Security Act, it is hard to find anything simple or specific but presumably the dividing line is 65 and after that one is "elderly".

As already noted, the Authority was created effective March 14, 1967. Public Housing Law § 499

The Authority, contemplating construction of projects for the elderly, arranged for a study to be made by Raymond & May Associates, professional planning consultants. The study was financed by the county, this because it

was intended that the projects accept tenants from the whole county and be located near a county complex.

At all times, the town officials contemplated that financial assistance would be obtained from HUD under the Act.

On September 9, 1968, the Town Board authorized an application for financial assistance under the Act for low-rent housing projects for about 300 units. It was found by the Board that in the Town there was "a need for such low-rent housing at rents within the means of low-income families".

The meetings of the Town Board are open to the public and are held on scheduled dates; they can be and often are reported by the news media.

Under date of September 16, 1968, the Town and the Authority made an agreement called "cooperation agreement". This is required and the form prescribed by HUD (or its predecessor).

The Act, among other things, forbids in 42 U.S.C. § 1410(a) any financial assistance for projects unless the local body (the Town) has made an agreement with the public housing agency (the Authority) that

" * * * subsequent to the initiation of the low-rent housing project and within five years after the completion thereof, there has been or will be elimination, as certified by the local governing body, by demolition, condemnation, effective closing, or compulsory repair or improvement, of unsafe or insanitary dwelling units situated in the locality or metropolitan area substantially equal in number to the number of newly constructed dwelling units provided by such projects * * * ".

The cooperation agreement in evidence contains such a provision.

Under date of September 16, 1968 an application was submitted by the Authority to HUD for a preliminary loan for the program, which was described as one for 300 units, 225 or 75% to be for "elderly" and 75 or 25% to be for "non-

elderly". It was explained without contradiction that the program was not submitted as one entirely for the elderly because HUD preferred a "mix".

The Town Board then appointed on September 30, 1968 a "Citizen's Advisory Committee on Public Housing" of some 14 members.

In May 1969, the Raymond & May report was completed. This is entitled "Study of Housing Needs of the Low Income Elderly in Rockland County". One of the conclusions was as follows (p. 4):

> "The low-income housing planned by the Ramapo Housing Authority [this is apparently a reference to the 300 units referred to above] is urgently needed and should be developed as soon as possible. Additional housing programs for elderly residents of low and moderate income should be initiated as soon as possible."

Evidently HUD studied the Ramapo program over a period of time and under date of December 18, 1969 entered into the preliminary loan contract.

The Authority then on January 19, 1970 gave public notice, inviting bids by developers (a term defined in the zoning ordinance) to provide all or some part of the 300 housing units. The idea appears to have been that bidders would select and acquire sites, would construct the housing units, and would sell the site and units thereon to the Authority at a contract price on a "turnkey" basis. All this was subject, not only to the approval of the Authority, but also to the approval of HUD, which was expected to provide financial assistance.

Proposals were submitted by Modular for Airmont and by Park for Hillcrest, which proposals met the approval of HUD and of the Authority. Airmont was for 120 units, 90 for elderly and 30 for non-elderly. Hillcrest was for 78 units, 59 for elderly and 19 for non-elderly. This totals 198 units as against the invitation to bid for 300 units. There are no present plans to build beyond the 198 units.

The projects contemplated 2 story garden apartments in a number of detached buildings, Airmont being on about a 7 acre site and Hillcrest on about a 4½ acre site.

If the projects were to be permitted, a change in the zoning ordinance was necessary. Changes were adopted by the Town Board effective June 1, 1970. These changes permitted "senior citizen public housing developments" if certain detailed requirements were met and if a special permit were issued by the Town Board.

Modular and Park (or one of its officers) applied for special permits. Their applications were referred to the Planning Board.

After inspections and studies, the Planning Board on June 16, 1970 by vote of four to one recommended that variances be granted to Airmont and Hillcrest. Thereafter the Planning Board made a report to the Town Board in the form of the minutes of a special meeting of the Planning Board on July 2, 1970. This report contains findings which amount to approval of special permits for the two projects but one member (out of four present at the meeting) voted "no" as to some findings.

After one or more public meetings to inform citizens of the Town about the projects, the Town Board had a public hearing on July 6, 1970 to consider the applications for special permits. Many views were expressed pro and con. The meeting was long. The transcript runs something over 300 pages.

The Town Board made its decision to issue the two permits. On Airmont, the vote was 3 for, 1 against and 1 not voting; on Hillcrest, the vote was 4 for and 1 against.

This action was then commenced by plaintiffs on July 29, 1970.

At about the same time, two proceedings were commenced in the state court under Article 78 of the CPLR, one to review the special permit for Airmont and the other to review the special permit for Hillcrest.

On December 7, 1970, the Appellate Division confirmed the determination of the Town Board to issue a special permit for Airmont (Farrelly v. Town of Ramapo, 35 A.D.2d 957, 317 N.Y.S.2d 837) and also for Hillcrest (Greenwald v. Town of Ramapo, 35 A.D.2d 958, 317 N.Y.S.2d 839). The memorandum opinion noted that HUD had itself found a need by the Town for the housing and had recommended issuance of the special permits; it also noted a finding by the Town Board that the two projects complied with the "general considerations and principles" of the master plan and that this was supported by "substantial evidence".

Under date of December 29, 1970 the Authority made two contracts of sale, one with Modular and one with Park. These provide that the developers will complete construction of the garden apartment units at Airmont and Hillcrest and on completion will transfer title to the Authority, against a purchase price of $2,623,120 for Airmont and $1,707,484 for Hillcrest. These contracts bear the approval of HUD dated December 30, 1970.

It also appears that under date of December 30, 1970 the Authority and HUD made an agreement, styled "Consolidated Annual Contributions Contract", under which, in the opaque verbiage of official documents, some sort of financial assistance is promised to be supplied by HUD.

A third proceeding (Marino) was brought under Article 78 to set aside the acceptance by the Authority of the proposal of Modular to build Airmont. An order to show cause was made which stayed Modular and the Authority from proceeding with Airmont. Modular moved in the Supreme Court, Rockland County, to vacate this stay. After a hearing and on January 12, 1971, Mr. Justice Silberman granted the motion and vacated the stay. His reason was that Modular had demonstrated that it would suffer "a substantial pecuniary loss" from the stay whereas petitioners (presumably in the same class as plaintiffs here) failed to show that they would suffer "any damage".

The developers were then able to start work on the projects and they did so. HUD stands ready to carry out its commitment for financial assistance.

Such was the situation when plaintiffs obtained an order to show cause from Judge Bryan on February 3, 1971—something over six months after the action was commenced.

There is grave doubt that these plaintiffs have any standing to question the acts of defendants. They are simply residents of the area who object to increasing the density of population there. This is not an interest protected by the Act. The situation is totally unlike Powelton Civic Home Owners Association v. Department, etc., 284 F.Supp. 809 (E.D.Pa.1968) where plaintiffs were being displaced by the project, the Act specifically directing relocation to adequate dwellings. Plaintiffs alleged in *Powelton* that there were no adequate relocation dwellings. 284 F.Supp. at 821. Much closer is Shannon v. United States Department of Housing, etc., 436 F.2d 809 (3d Cir. 1970) but injury on the facts was much more direct and apparent.

Because of uncertainty in the doctrine, this motion should not be decided on the issue of standing. Accordingly, it will be assumed that plaintiffs have standing.

The first obstacle to the grant of any preliminary injunction is that there was no showing of irreparable injury. It was not shown whether plaintiffs owned their residences or not; presumably the claim of injury was principally that "the property values" of plaintiffs would be "decreased" because of the projects (complaint, para. 4). In any event, money damages would compensate for a decreased value. As to an adverse effect on "the living environment" of plaintiffs (complaint, para. 6), it is exceedingly difficult to determine such an issue, since it is so largely a matter of personal taste. Those who

testified for plaintiffs expressed a desire to have the area remain just as it is, without any more people. This is entirely understandable, perhaps natural. But there is no constitutional right to have things remain as they are and by any objective test plaintiffs failed to prove that the environment would be harmed. The sites are 7 and 4½ acres; the buildings are to be surrounded by open spaces, gardens, ponds and the like; no building is to be more than 2 stories; there is a screening of plants from the public roads. On the contrary, a preliminary injunction would cause harm to the developers because if construction is delayed, their costs will increase. So Mr. Justice Silberman found in the state court.

On the merits, moreover, it cannot be found that plaintiffs have any substantial chance of success.

■■ The alleged violations of state law can be put aside at once. The state courts have already approved the projects; indeed, it was found that they furthered "the public policy of the State" in respect of low rent housing (Article XVIII of the State Constitution). And even if there were violations of state law, no constitutional rights of plaintiffs are thereby violated.

■■ As to violations of federal law, it is said that no need for the housing was demonstrated. There must be a finding to the contrary. On this record, from the testimony of Mr. Emanuel and from the "Development Plan" and from the Raymond & May report, need was established and this is true, both as to the elderly and the non-elderly. HUD so found and there is no basis for interfering with its decision.

The principal violation of federal law is said to be that part of 42 U.S.C. § 1410(a) which requires an agreement between the local "governing body" and the local "public housing agency" that within five years there will be elimination "as certified by the local governing body" of "unsafe or insanitary dwelling units" equal in number to those in the federally assisted projects.

There has been no violation of this provision because in fact such an agreement is part of the "cooperation agreement" of September 16, 1968.

Plaintiffs say, however, that in fact this agreement cannot be performed because there are not presently 198 "unsafe or insanitary dwelling units" in the Town.

Whether there can be performance or not is of no present moment. Congress has required only an agreement, not performance.

It is moreover impossible to say now that in 5 years there will not be 198 unsafe or insanitary dwelling units in the Town. It may also be noted that the 5 year period, under certain conditions, may be "deferred" by HUD (42 U.S.C. § 1410(a)).

There is no definition in the statute of "unsafe" or "insanitary" and counsel for HUD advise that there is no background material on the elimination proviso.

Mr. Emanuel supervised the preparation of the studies in the July 1966 "Development Plan". His staff actually visited every parcel of real estate and every structure in the Town. Their estimate was that there were about 450 "substandard" units in 1966 in the Town and his testimony indicates that these would be "unsafe" or "insanitary". This is because "substandard" includes the Census term "dilapidated" and the Census term "lacking adequate plumbing facilities". Moreover, in 1960 the Census reported that there were 353 "substandard" units in the Town and 458 "deteriorating" units.

In the light of this evidence there seems no reason to doubt that there are more than 198 units available for elimination within 5 years, within the terms of the "cooperation agreement".

The foregoing contains the findings of fact and conclusions of law required by Fed.R.Civ.P. 52(a).

The motion for a preliminary injunction is denied.

So ordered.