Morton B. Silberman, J.
This is an article 78 proceeding to review the award of a construction contract granted by the *45 respondent Town of Ramapo Housing Authority (hereinafter “Housing Authority”) to respondent National Modular Systems, Inc. (hereinafter “ Modular ”). The case presents several interesting and vexatious questions. The primary question of law is whether the competitive bid statutes of New York which require the award of public contracts to the lowest responsible bidder are applicable to Federally financed ‘ ‘ turnkey ’ ’ housing projects.
PACTS
On September 9,1968 the respondent Town Board of the Town of Ramapo (hereinafter “ Town Board ”) authorized an application on behalf of the town for financial assistance under the United States Housing Act of 1937, as amended (U. S. Code, tit. 42, § 1401 et seq.), to enable the local Housing Authority to contract for the development of low-income housing of approximately 300 units. On September 16, 1968 the Town Board entered into a co-operation agreement with the Housing Authority approving the latter’s application for financial assistance. The resolution certified that a need exists in the town for low-rent housing for low-income families and for the elderly. The Town Board appointed a “ Citizen’s Advisory Committee on Public Housing ” which submitted a report in May, 1969 confirming the need for low-rent housing in the town.[1]
On January 19, 1970 the Housing Authority advertised for bids for the proposed 300-unit development. The legal notice indicated that 225 units were to be designed for elderly persons and 75 units for nonelderly persons; and, further, that bids had to comply with the “ turnkey ” program of the Federal Department of Housing and Urban Development (hereinafter “ HUD ”). (At this point it is sufficient for our purposes to observe that the ‘ ‘ turnkey ’ ’ program means, in essence, that a private developer agrees to build the project on land he owns or will acquire and to sell the development to the Housing Authority upon completion. Hence, the appellation “turnkey”.) Additionally, the notice for bids required that all proposals contain a certificate providing for compliance with the prevailing wage rate schedules in this State.
On February 26, 1970, respondent Modular submitted its proposal for the construction of 120 modular units (90 of which are allocated to elderly persons) in the form of two-story, *46 detached garden apartments on approximately six to seven acres of land. The proposal indicated that Modular had an option to purchase the land to be developed. Subsequently, Modular did purchase the site in question. Six other bids were similarly submitted for board consideration.[2] On March 12, 1970 the Housing Authority selected four of the proposals, including Modular’s bid, and forwarded them to HUD for Federal evaluation. On April 17,1970 the Housing Authority tentatively approved the Modular proposal. On June 1, 1970 the Town Zoning Ordinance was amended to permit low-income housing, provided that a special permit be granted by the Town Board.
On July 2, 1970 HUD tentatively approved the Modular proposal and the Town Planning Board granted Modular’s request for certain variances. On July 6, 1970 the Town Board approved the issuance of a special permit to Modular. Immediately thereafter residents in the vicinity of the proposed project commenced an article 78 CPLR proceeding to review the determinations of the Planning Board and the Town Board. Parenthetically, it should be noted that a second low-income development (the “ Hillcrest ” site) had been awarded to Fairway Park, Inc., and a separate article 78 CPLR proceeding was brought in regard thereto.
On July 29, 1970, residents in the vicinity of both projects commenced a class action in the United States District Court against HUD, the town, and the Housing Authority (Fletcher v. Romney, 323 F. Supp. 189). Before judicial resolution in any of the proceedings, both the Planning Board (on Nov. 11, 1970) and the Town Board (on Dec. 1, 1970) officially approved the Modular project.
On December 7, 1970 the Appellate Division unanimously dismissed the petitions which had attacked the zoning changes (Matter of Farrelly v. Town of Ramapo, 35 A D 2d 957; Matter of Greenwald v. Town of Ramapo, 35 A D 2d 958). Specifically, as to the Modular site the court found that the amended ordinance was necessary to provide for low-income housing, the latter fact having been established as a need of the community, and that the site conformed to the town’s master zoning plan. More significant is the court’s observation that “the Town Board’s *47 determination furthers the public policy of the State as expressed in Article XVIII of the New York State Constitution and section 2 of the Public Housing Law ’ A motion for leave to appeal to the Court of Appeals was denied (28 N Y 2d 484.)
On December 21, 1970 the Housing Authority and HUD executed a ‘ ‘ Consolidated Annual Contributions Contract ’ ’ relating to the financing of the Modular project. On December 28, 1970 the within action was commenced. Process was served on the Town Clerk on December 29, 1970. On the same day the Housing Authority and Modular executed a 1 ‘ turnkey ’ ’ contract whereby the Authority agreed to purchase the completed project for the sum of $2,623,120. The “turnkey” contract was approved by HUD the following day.
On January 12, 1971 this court rendered a decision on Modular’s motion to vacate the stay embodied in the order to show cause. Petitioners failed to offer any evidence with respect to their claim to damages, and, consequently, the motion to vacate the stay was granted. The housing project is presently under construction. On February 5, 1971 this court granted a motion by a class of low-income and elderly residents of the town to intervene in the proceeding. Subsequently, on March 1, 1971, the United States District Court, in the class action, denied an application for a preliminary injunction (Fletcher v. Romney, 323 F. Supp. 189, supra).
STANDING TO SUE
Respondents’ contention that petitioners lack capacity to sue is without merit. It has been consistently held that taxpayer residents of the community involved have sufficient legal status to seek court review of nonfiscal judgments by public officials of a municipality (Matter of Bon-Air Estates v. Building Inspector of Town of Ramapo, 31 A D 2d 502 [2d Dept.]; Matter of Werfel v. Fitzgerald, 23 A D 2d 306 [2d Dept.]; Matter of Policemen’s Benev. Assn. v. Board of Trustees, 21 A D 2d 693 [2d Dept.]; see Massachusetts v. Mellon, 262 U. S. 447; Matter of Andresen v. Rice, 277 N. Y. 271, 281; Matter of Procaccino v. Stewart, 60 Misc 2d 551). This rule has been applied in cases involving alleged violations of the competitive bid statutes (Matter of Dictaphone Corp. v. O’Leary, 287 N. Y. 491; Matter of General Bldg. Contrs. v. County of Oneida, 54 Misc 2d 260). Additionally, recent Federal decisions have accorded standing to homeowners in the affected neighborhood, where the complaints concerned some aspect of HUD financing (which is present here), upon the ground that such persons are within the zone of pro *48 tection of the United States Housing Act of 1937 (Northwest Residents Assn. v. HUD, 325 F. Supp. 65 [U. S. Dist. Ct., E. D., Wis. ]; Shannon v. HUD, 305 F. Supp. 205 [U. S. Dist. Ct., E. D., Pa.]). It would be incongruous to hold that standing is lacking in the State court but exists in the Federal arena.
STATUTE OF LIMITATIONS
Respondents urge that the four months’ Statute of Limitations (CPLR 217) bars the proceeding insofar as petitioners challenge the validity of the project award to Modular. The argument is without merit. The proceeding was commenced one day after respondent Housing Authority executed the contract of sale with Modular and any legal action prior thereto would have been premature.
APPLICABILITY OF THE COMPETITIVE BID REQUIREMENTS
Before analyzing the diverse legislation allegedly violated by respondents, an understanding of the ‘ ‘ turnkey ’ ’ concept in general terms is required so as to fully appreciate the primary thrust of petitioners’ contention: that this State’s competitive bid legislation must be deemed to apply to the award granted Modular.
(a) The “ turnkey ” contract
In the usual situation involving the construction of a public project, the local housing authority requests competitive bids for the construction of buildings on property it owns. An award is made to the lowest responsible bidder. The local authority performs part of the work where feasible, uses its own architects and contractors where possible, fixes the design of the project and obtains interim financing through the use of tax funds, bond issues or Federal-State subsidies. “Turnkey,” on the other hand, differs markedly from the ordinary low-income housing project in many respects. “Turnkey” operates only in those areas where the governing body of the community has certified a need for low-income housing.
“ Turnkey ” permits a developer to submit proposals regarding property he owns or will own at the time of construction. The developer uses his own architects and presents an original design. This flexibility in design, and such entrepreneur participation, are factors often absent from usual public housing construction: Upon approval of the site, design and cost estimate, the local housing authority executes a contract of sale with the developer to purchase the completed project. This contract *49 is backed by the financial commitment of the Federal Government.
The court professes no expertise in the complex area of low-income housing financing. However, a perusal of the contracts between the Housing Authority, the developer and HUD, and a reading of HUD’s regulations pertaining to financing, reveals in general what transpires. The local housing authority and HUD must approve of the developer’s cost estimate and the relevant architectural specifications. The developer agrees to seek private financing, and the Federal Government in no way provides interim financing. Upon completion of the project the developer, pursuant to prior agreement, sells the property to the local housing authority. The contract provides that if the local housing authority defaults or is unable to perform for any reason, including court action against it, the Federal Government through HUD will purchase and operate the premises. On the other hand, if the local housing authority consummates the purchase, its obligations are delineated in a “ Cooperation Agreement” and a “ Consolidated Annual Contributions Contract.” These agreements generally provide that before the Federal Government makes any contributions, other than the initial sum to pay the developer upon transfer of title, the local authority will issue financing instruments to effect repayment. These instruments are usually in the form of tax-exempt term bonds, and mature at the end of a specified term (the maturity date being 40 years at bar). HUD stands behind the bonds, rendering them fully marketable. HUD agrees to pay all interest, and the bonds themselves state that they are not certificates of indebtedness of the municipality but are obligations of the Federal Government. This insures construction lenders a source for reimbursement and enables the developer to secure adequate financing.
In theory, it would appear that the local housing authority reimburses HUD for the cost development loan by raising funds through the issuance of a series of tax-exempt bonds. If the project operates at a profit, reimbursement does occur to the extent of net operating revenue. Thus, no local funds are expended in reimbursement. In practice, however, the project invariably operates at a deficit with operating expenses (maintenance, administration, bond amortization) exceeding revenues. Nonetheless, HUD agrees to make good the deficiency by making annual contributions to the local authority, which contributions include the debt service (amortization) of the bonds.
At the end of 40 years the project belongs to the local housing authority, without payment of any funds from local sources. *50 Consequently, the project must be considered as being solely Federally financed. If the local housing authority operates the project at a profit, it repays the Federal Government for cost development out of net operating revenues. If the project operates at a deficit, the Federal Government subsidizes the deficiency. In either event, the ultimate result is that the community receives its declared needed housing at virtually no cost to local taxpayers.
(b) Competitive bidding
Petitioners allege that sections 151, 151-a and 152 of the Public Housing Law and portions of the General Municipal Law have been violated. Section 152, which refers to the prevailing wage schedules of this State, has been complied with and the schedule is incorporated in the 1 ‘ Supplemental Contract ’ ’ executed by Modular and the Housing Authority (see U. S. Code, tit. 42, § 1416, subd. [1]). Section 151-a provides that the agency “ charged with the duty of preparing specifications ” in connection with the project shall prepare separate specifications for the three major job components (plumbing, heating and electric wiring) to enable competitive bidding on each specified job element. It is difficult, if not impossible, to perceive how section 151-a could ever apply to a “ turnkey ” project. Clearly, the statutory duty imposed relates only to conventional construction contracts and not to purchases of completed projects built by a developer on its own land pursuant to its own specifications.
Subdivision 1 of section 151 requires competitive bidding on contracts of an authority in excess of $10,000 1 ‘ for demolition, excavation, construction, alteration, renovation or for purchase of materials or supplies.” Subdivision 5 of said section requires the submission of a 1 ‘ non-collusive bidding certification” on any bid or proposal made, “where competitive bidding is required by statute, rule or regulation ’ ’. Article 5-A of the General Municipal Law is this State’s general competitive bidding legislation, and subdivision 1 of section 103 thereof provides that “ except as otherwise expressly provided by an act of the legislature * * * all contracts for public work * * * and all purchase contracts * * * shall be awarded * * * to the lowest responsible bidder ”. Section 103-d of the General Municipal Law is virtually identical to subdivision 5 of section 151 of the Public Housing Law regarding the requirement of a non-collusion certificate.
The parallel legislation presents a definitional coverage problem. Section 103 applies only to political subdivisions or districts therein; and the Town of Eamapo Housing Authority, *51 which is a public corporation (Public Housing Law, § 3, subd. 2 ; § 499), is neither a political subdivision nor a district therein (Mount Vernon Housing Auth. v. American Motorists Ins. Co., 21 A D 2d 788 [2d Dept.]; Matter of Driscoll v. Troy Housing Auth., 6 A D 2d 981, revd. on other grounds 6 N Y 2d 513; Ciulla v. State of New York, 191 Misc. 528; Borak v. Golder, 190 Misc. 366, 384; General Municipal Law, §§ 2, 100, subd. 1; Public Housing Law, § 3, subd. 5; cf. Public Authorities Law, § 2601). Nonetheless, a housing authority is responsive to municipal policy to some extent (Kelly v. Cohoes Housing Auth., 27 A D 2d 463, 465, affd. 23 N Y 2d 692) and for certain purposes- may be considered as ah agency of a political subdivision (Ciulla v. State of New York, 191 Misc. 528, 532, supra; see Easley v. New York State Thruway Auth., 1 N Y 2d 374, 376). Consequently, it is the view of the court that, since the competitive bidding requirements of the Public Housing Law and of the General Municipal Law are similar in language, and since amendments to public contract statutes are usually effected by single legislation (e.g., L. 1967, ch. 751), the General Municipal Law is applicable to respondent Housing Authority, at least for the limited purpose of evaluating the policies underlying these statutes. Significantly, it is clear that section 103-e of the General Municipal Law, which provides penalties for collusion on public contracts, applies to housing authorities, since that statute specifically includes a 11 public corporation ’ ’ within its purview. Furthermore, while a vast majority of the cases involving competitive bid violations concerned interpretation of section 103 of the General Municipal Law, logic dictates that the judicial construction carry over into section 151 of the Public Housing Law.
Competitive bidding on public contracts has long formed a part of New York law, having originated in local charters and ordinances as far back as the 1850’s (see, e.g., Brady v. Mayor, etc., of City of N. Y., 20 N. Y. 312; People ex rel. Smith v. Flagg, 17 N. Y. 584). Section 103 of the General Municipal Law is derived, in part, from former section 26-a of the Public Works Law (L. 1934, ch. 641; renumbered § 15 by L. 1938, ch. 279, repealed by L. 1968, ch. 420, § 397) which apparently was this State’s first general law requiring competitive bidding on public contracts. Section 103 was enacted in 1953 (L. 1953, ch. 861, § 18) to codify the diverse legislation then on the books regarding competitive bidding (N. Y. Legis. Annual, 1953, p. 166). In its declaration of policy the Legislature stated (General Municipal Law, § 100-a): “ It is hereby declared to be the policy of this state that this article shall be construed in the negotiation *52 of contracts for public works and public purchases to which political subdivisions or [any] district therein is a party so as to assure the prudent and economical use of public moneys for the benefit of all the inhabitants of the state and to facilitate the acquisition of facilities and commodities of maximum quality at the lowest possible cost.”
The Court of Appeals recently had occasion to reiterate the underlying rationale of these provisions (Jered Contr. Corp. v. New York City Tr. Auth., 22 N Y 2d 187, 192-193) wherein it said: ‘ ‘ The provisions of the statutes and ordinances of this State requiring competitive bidding in the letting of public contracts evince a strong public policy of f ostering honest competition in order to obtain the best work or supplies at the lowest possible price. In addition, the obvious purpose of such statutes is to guard against favoritism, improvidence, extravagance, fraud and corruption.”
Clearly, these statutes have been construed for the benefit of taxpayers and not bidders, the guidepost being the public interest (American Inst. for Imported Steel v. County of Erie, 32 A D 2d 231, 233; see Matter of Sweet Assoc, v. Gallman, 36 A D 2d 95; Matter of Warren Bros. Co. v. Craner, 30 A D 2d 437; Matter of Allen v. Eberling, 24 A D 2d 594 [2d Dept.]; see Legis. Mem., N. Y. Legis. Annual, 1953, p. 166). A contract executed in violation of the statutory provisions is null and void (Gerzof v. Sweeney, 16 N Y 2d 206; Brady v. Mayor, etc., of City of N. Y., 20 N. Y. 312, supra, Matter of Resco Equip. & Supply Corp. v. City Council of City of Watertown, 34 A D 2d 1088) and our public policy is so strong that under such circumstances the contractor cannot recover in quantum meruit for work done (Jered Contr. Corp. v. New York City Tr. Auth., supra) and may be liable for repayment of proceeds already received (Gerzof v. Sweeney, 22 N Y 2d 297; see Ann. 33 ALR 3d 397, Competitive Bids — Violation — Becovery). Moreover, while the trend of decisions appears to be taking a more equitable approach (People v. Rouse Constr. Corp., 26 A D 2d 405), the traditional contract rule has been applied in municipal bids that where a unilateral mistake is made by the bidder the bid may not be withdrawn (see Newman, Belief for Mistake in Contracting, 54 Corn. L. Rev. 243 [1968]; Ann. 33 ALR 3d 1164, Municipality — Quasi-Contract —Liability).
(c) Competitive bidding vs. turnkey — The cases, policies and arguments.
As stated, the core issue is whether the New York competitive bid statutes, which require the submission of a noncollusion cer *53 tificate and the award of public contracts to the lowest responsible bidder, are applicable to a “ turnkey ” low-income development project.
Petitioners place reliance upon the decision of Mr. Justice Graves of the Supreme Court, St. Lawrence County, in Matter of North Country Development Corp. v. Massena Housing Auth. (65 Misc 2d 105), decided on July 14,1970. Respondents, in turn, urge that Massena is factually distinguishable, and that recent adjudications in sister State jurisdictions uphold noncompliance with State competitive bid statutes (Lehigh Constr. Co. v. Housing Auth. of City of Orange, 56 N. J. 447 [decided July 7, 1970]; Commissioner of Labor & Inds. v. Lawrence Housing Auth., 261 N. E. 2d 331 [Mass., decided Aug. 12, 1970]).
In Massena, an article 78 proceeding was commenced prior to the adoption of a “ turnkey ” contract by HUD. The court treated the matter as if a “ turnkey ’’.contract existed, since it would have come into being had not the lawsuit been instituted. Consequently, this purported departure from our facts is of no moment. However, there is one very significant distinction between Massena and the within matter. In Massena, the local housing authority was the owner of the property to be developed. The authority apparently agreed to sell the parcel and to reacquire the completed project. It awarded the “turnkey” contract to the highest bidder, the bid itself not being in compliance with either our competitive bidding statutes or prevailing wage legislation (Public Housing Law, §§ 151,151-a, 152).
An unsuccessful bidder commenced the article 78 proceeding to set aside the award. Justice Graves held that in the absence of a specific exemption from competitive bidding, the “general provisions and restrictions [of the Public Housing Law] are applicable even though Federal funds only are involved ” (65 Mise 2d 105, 111). The petition was granted to the extent that new bids were directed to be submitted to the local housing authority in compliance with the pertinent statutes.
Patently, Massena is not on all fours with this case. The holding therein clearly relates to the fact that the property to be developed was at all relevant times owned by the local authority. Furthermore, insofar as the court expressed the view that a “ turnkey ” project would be governed by the same rationale, that language must be read in its proper context: that a ‘1 turnkey ” project on property always owned by the authority is governed by New York law. With this view I am in complete accord; for, Massena merely represents an illustration of a local authority attempting to avoid New York bidding requirements on public works, in the guise of compliance with Federal regula *54 tions. That is not the ease at bar. Insofar as Massena may be read as holding that a pure 1 ‘ turnkey ’ ’ program must comply with State competitive bid legislation, I decline to follow it.
As indicated earlier, respondents rely upon two out-of-State decisions which, significantly, involved pure 1 ‘ turnkey ’ ’ contracts such as at bar (Lehigh Constr. Co. v. Housing Auth. of City of Orange, 56 N. J. 447, supra; Commissioner of Labor & Inds. v. Lawrence Housing Auth., 261 N. E. 2d 331 [Mass.], supra). These eases, in simplistic terms, hold that their respective State competitive bid statutes have no application to pure “ turnkey ” projects. However, these cases do not meet the issues raised here; namely, whether the policy underlying this State’s competitive bid legislation requires its application to a “ turnkey ” project. In this court’s opinion, the pertinent New York legislation ought not apply, unless our taxpayers bear an intimate relationship to the ultimate source of funding. Otherwise what legitimate State purpose exists to be vindicated by the frustration and inhibition of what is, in reality, a Federally financed project? One could argue that because petitioners herein are not only New York State taxpayers but are also Federal taxpayers, that this State has a compelling interest in how the project is to be awarded, although coneededly Federally financed. Yet, clearly, the purported local interest is de minimis with respect to the ultimate source of funding.
I am in accord with Mr. Justice Heaves’ determination that the source of the funding is irrelevant where, in fact, the local authority owns the subject property. Under those circumstances the strong public policy of this State mandates compliance with its competitive bid requirements. However, in the pure “ turnkey ” situation, competitive bidding pertaining to the same location is a virtual impossibility since each proposed developer offers bids regarding separate parcels of real property. It is the uniqueness of the location of the project, therefore, which precludes competitive bidding in the traditional sense.
HUD has chosen utilization of “ turnkey,” and Congress has sanctioned the procedure to avoid compliance with cumbersome State requirements (see Appendix). “Turnkey” saves time and money, which is no inconsequential matter (ibid.). Furthermore, there is a form of competitive bidding amply illustrated by the facts at bar which further assures the public of low-income quality housing being obtained under desirable circumstances. If “ turnkey ” is to remain a viable concept — providing quality low-income housing expeditiously and at substantial savings — State bidding legislation must yield.
*55 Additionally, it will not do to argue here, as in Massena, that “ turnkey-” illegally circumvents competitive bid requirements, since the project could have been accomplished in another manner which would have mandated compliance with said statutes. Thus, merely because the Town or Housing Authority could have exercised their powers of condemnation (Town Law, § 64, subd. 2; Public Housing Law, §§ 37, 120, 121) and let construction contracts on the property so acquired, does not lead to the conclusion that ‘1 turnkey ’ ’ represents a surreptitious attempt to eliminate competitive bidding. This is not merely a matter of form over substance. The different procedures in the acquisition of property vary substantially as do the practicalities. In the ordinary letting of construction contracts on property owned by the municipality there is no Federal subsidy involved, the general contractor looks only to the municipality for payment, local taxpayer moneys alone are used for that purpose, fiscal judgments arise and State-mandated debt limits must be considered. Consequently, the applicability of the bid legislation narrows down to a question of statutory construction.
There is no common-law requirement that an authority must accept the lowest bid on contracts relating to its function or, in fact, to require competitive bidding if the statute of origin so defines the Authority as to exempt it from the ambit of competitive bid legislation (Matter of Agesen v. Catherwood, 26 N Y 2d 521; Matter of Plumbing Assn. v. New York State Thruway Auth., 5 N Y 2d 420; Thompson Constr. Corp. v. Dormitory Auth., 48 Misc 2d 296:; Maribu v. Nohowec, 161 Misc. 944; 10 McQuillin, Municipal Corporations [1966 rev. ed.], § 29.31; 3 Antieau, Municipal Corporations, § 23.13). Since the competitive bid statutes are in derogation of the common law, the courts have applied the cannon of strict construction and have found implicit exemptions from the legislation in diverse circumstances (Baird v. Mayor, etc., of City of N. Y., 96 N. Y. 566; Davies v. Mayor, etc., City of N. Y., 83 N. Y. 207; Swift v. Mayor, etc., City of N. Y., 83 N. Y. 528; Harlem Gas-Light Co. v. City of N. Y., 33 N. Y. 309; People ex rel. Smith v. Flagg, 17 N. Y. 584, supra; Hurd v. Erie County, 34 A D 2d 289; Matter of Lynd v. Heffernan, 286 App. Div. 597, mot. to withdraw app. granted 1 N Y 2d 919; Voelcker v. Schnell, 166 N. Y. S. 420; see Matter of Sweet Assoc. v. Gallman, 36 A D 2d 95; 19 Opn. St. Comp. 120 [Op. No. 63-169]; 16 Opn. St. Comp. 371 [Op. No. 60-700]; 10 McQuillin, Municipal Corporations, § 29.32 [1966 rev. ed.]). Undoubtedly, ‘ ‘ there is a good deal of judicial willingness ’ ’ to give the competitive bid requirements a reasonable construction (1 Antieau, *56 Municipal Corporations, § 10.26, p. 753) and to apply them in a reasonable manner, lest they eliminate the authority of a municipality “to deal with problems in a sensible, practical way” (Whelan v. New Jersey Power & Light Co., 45 N. J. 237, 252; see Wright v. Wagner, 405 Pa. 546, cert. den. 369 U. S. 849; 1 Antieau, op. cit. § 10.28). Responsible management, which is a subsidiary facet of our bid statutes, would appear to dictate that the “ turnkey ” project proceed unhampered by restrictive State procedures (see Talcott v. City of Buffalo, 125 N. Y. 280).
It is the duty of the court to say that the transaction, although within the letter, is not within the intention of the legislation and, therefore, not proscribed by the statute (Williams v. Williams, 23 N Y 2d 592, 599; Matter of Chatlos v. McGoldrick, 302 N. Y. 380, 388; Matter of Meyer, 209 N. Y. 386, 389-390; Morgan v. Hedstrom, 164 N. Y. 224, 230). Indeed, the broad co-operation and public housing acquisition legislation of this State (N. Y. Const., art. XVIII, § 2; Public Housing Law, § 37, subd. 1, pars, [i], [m]; §§ 120, 121, 220), which are tp be liberally construed as provided for in this State’s declaration of commitment to provide decent housing (N. Y. Const., art. XVIII, §§ 1, 2; Public Housing Law, §§ 2, 76-a, 220), implicitly modify the competitive bid requirements alleged to be applicable herein.[3] A contrary interpretation would lead to absurd results: that despite this State’s overwhelming need for low-income housing, its public policy favoring participation of private enterprise in such construction (see Appendix), and the Legislature’s specific direction to housing authorities to co-operate and to do all things necessary to obtain Federal financing assistance, such projects must be frustrated in furtherance of a policy which bears no relationship to the evils it was designed to remedy.
For all of the foregoing reasons, the inappropriateness of competitive bidding is self-evident. This construction of section 151 of the Public Housing Law and section 103 of the General Municipal Law serves the public interest, which is the overriding principle of first magnitude underlying the statutory purpose. Ho violence is done to statutory language, intent or spirit and a harmonious result is seemingly achieved, in view of the fact that the penal provisions of section 103-e of the General *57 Municipal Law and the civil damage provisions of our anti-competitive statute (General Business Law, § 340; Columbia Gas of N. Y. v. New York Elec, & Gas Corp., 28 N Y 2d 117) continue to apply.
THE PRE-EMPTION DOCTRINE
Insofar as the applicability of the competitive bid legislation is concerned, the court has gone no further than to apply the usual canons of statutory interpretation in finding that said requirements are inapplicable. Nonetheless, while the court has gone to great lengths in evaluating the rationales and competing policies underlying the diverse regulations, rather than predicate adjudication solely upon such grounds, it prefers to rest its decision alternatively upon another foundation; namely, the “ supremacy clause ” of the Federal Constitution (art. "VT, § 2).
The supremacy clause, rather appropriately, means what it says: that the “ Laws of the United States * * * shall be the supreme Law of the Land” (art. "VI, § 2). This principle is commonly referred to as the doctrine of pre-emption. Surprisingly, the pre-emption doctrine is mentioned but fleetingly by one of the parties, although the briefs in total exceed over 200 pages. The recent decision of the United States Supreme Court in James v. Valtierra (402 U. S. 137) is not dispositive. There the court held that the supremacy clause did not obligate localities to accept Federal aid where such aid had been rejected by the affected voters pursuant to a statutorily required local referendum. At bar, Federal aid has been accepted and Valtierra has no application to the question presented here: do HUD regulations pre-empt New York statutes insofar as said statutes may be deemed to apply to “ turnkey ” transactions?
The pre-emption doctrine requires State laws to defer to Federal legislation where either of three elements exist: (1) the scheme of Federal legislation is so complete and pervasive that no room is left for the State to supplement it; (2) the Federal interest is so dominant that State laws on the same subject must yield; or (3) the enforcement of the State statute presents a substantial conflict with the administration of the Federal program (Pennsylvania v. Nelson, 350 U. S. 497; Hines v. Davidowitz, 312 U. S. 52; People v. Broady, 5 N Y 2d 500, cert. den. 361 U. S. 8; see 16 Am. Jur. 2d, Constitutional Law, §§ 199-2101; 9 N. Y. Jur., Constitutional Law, §§ 99-107).
As a general rule constitutional issues affecting legislation will not be decided if the record presents other grounds for a final adjudication (Matter of Peters v. New York City Housing *58 Auth., 307 N. Y. 519, 527; Herkimer Corp. v. Village of Herkimer, 34 A D 2d 371, 373). However, the court has already indicated that resting a determination herein solely upon statutory interpretation as urged by respondents would do a disservice to the parties and public alike in view of the importance of the questions presented and the possibility of appellate review. Consequently, solely for the purposes of the ensuing discussion it shall be assumed that New York’s competitive bid statutes are applicable to ‘ ‘ turnkey ’ ’ contracts.
The pre-emption doctrine applies where valid regulations enacted by a Federal agency conflict with State legislation, although the latter may merely supplement the former (Campbell v. Hussey, 368 U. S. 297; Hood & Sons v. Du Mond, 336 U. S. 525; Catholic Med. Center of Brooklyn & Queens v. Rockefeller, 305 F. Supp. 1268 [D. C., E. D. N. Y.], vacated on other grounds 397 U. S. 820). In other words, the phrase in the supremacy clause “ Laws of the United States ” encompasses valid Federal regulations
HUD has been given broad rule-making powers (U. S. Code, tit. 42, § 1408), and its regulations pertaining to the stages involved in developing a “ turnkey ” program are found in its manual entitled “Low-Rent Housing Turnkey Handbook ” (RH 7420.1 [June, 1969, revised May, 1970]; see Code of Fed. Reg., tit. 24, § 1520.6). A predecessor version of the handbook was sustained by the United States Supreme Court as a proper exercise of HUD’s authority (Thorpe v. Housing Auth., 393 U. S. 268, 275, 277 [1969]; cf. Ranjel v. City of Lansing, 417 F. 2d 321, 323 [6th Cir.]). The fact that the. prior handbook was advisory in language rather than mandatory, as is the present version, is immaterial, since Thorpe deemed the regulations to be binding upon the local housing authority (393 U. S., at p. 276). Furthermore, any attack on the regulations per se must fail in light of Thorpe and those cases which hold that regulations enacted by the administrative agency to whom execution of the statute was delegated, are deemed valid in the absence of proof to the contrary (Power Reactor Co. v. Electricians, 367 U. S. 396, 408; United States v. Barrett, 315 F. Supp. 941 [W. Va., 1970], affd. 442 F. 2d 642).
In order to properly evaluate the doctrine of pre-emption to a particular fact-pattern, the court must consider the underlying policy considerations of the respective legislation, which requires an analysis of what is being regulated, by whom, for what purpose, statutory language, Congressional intent and potential frustration of Federal policy (Baltimore Shippers & Receivers *59 Assn. v. Public Utilities Comm. of Cal., 268 F. Supp. 836, 842 [D. C., Calif.], affd. 389 U. S. 583; see Fitzgerald v. Catherwood, 388 F. 2d 400, 406 [2d Cir.], cert. den. 391 Ú. S. 934).
Unquestionably, the Federal Government has recognized that the need for low-income housing is of national concern and the “ turnkey ” program is designed to alleviate local financial burdens so as to provide Federal funds for such housing (see Appendix). Additionally, the “ turnkey” method saves time and money in contradistinction to the usual low-income construction formulas. The State of New York, also, has recognized the need for low-income housing within its own borders and has enacted diverse legislation to attract and facilitate such development (see Appendix). Indeed, the provisions of the State Constitution relating to housing are in the process of revision to permit the Legislature to provide local communities with greater flexibility in adopting low-income housing programs (ibid.).
While there has recently been an upheaval in the traditional legal concepts involving housing (see Javins v. First Nat. Realty Corp., 428 F. 2d 1071 [C. A., D. C.]; Jackson v. Rivera, 65 Misc 2d 468; Note, 37 Brooklyn L. Rev. 387 [1971]), and the right to decent housing may become a principle of constitutional magnitude (Gautreaux v. Chicago Housing Auth., 436 F. 2d 306 [7th Cir.], cert. den. 402 U. S. 922), the housing problem lies within both the Federal and State domain. Clearly, were this a case of exclusive Federal jurisdiction there would be no authority in State courts to interfere with the functions of a Federal rule-making agency (Matter of Armand Schmoll, Inc. v. Federal Reserve Bank, 286 N. Y. 503). In the court’s opinion, housing represents a problem within the dual jurisdictions and the State may regulate purely local matters provided that no conflict exists in the concurrent regulatory scheme (see Southern Pacific Co. v. Arizona, 325 U. S. 761; Maurer v. Hamilton, 309 U. S. 598; 2 Antieau, Modern Constitutional Law, §§ 10:22-10:24 [1969 ed.]). Suffice it to say at this point that the advancement of New York’s interest in the maintenance of the life and health of its own inhabitants may not be delineated by State boundaries but is a function and concern of the Federal Government as well (cf. Adler v. Deegan, 251 N. Y. 467, 485).
The competitive bidding statutes of this State, as we have seen, have the subsidiary purpose of providing a check upon local officials in awarding public contracts. The primary thrust of the statutes is to insure quality construction at the lowest cost. This is precisely the design of the Federal ‘ ‘ turnkey ’ ’ program promulgated by HUD with the side benefit of expeditious *60 development. Clearly, insofar as the State competitive bidding statutes might be deemed to apply, and despite the fact that they merely supplement the Federal regulations, the statutory scheme is incompatible with the Federal program since both delay and higher cost would be expected to accrue if the State legislation were to be followed (Lehigh Constr. Co. v. Housing Auth. of City of Orange, 56 N. J. 447, supra).
Conflicts between State and Federal legislation should not be sought out where none clearly exist (Seagram & Sons v. Hostetter, 384 U. S. 35, 45, rehearing den. 384 U. S. 967); but where a conflict does exist due to a clear collision between State and Federal law, Federal law prevails and the incompatible State legislation must yield (Swift & Co. v. Wickham, 382 U. S. 111; Hamm v. Rock Hill, 379 U. S. 306 ; Sperry v. Florida, 373 U. S. 379; Free v. Bland, 369 U. S. 663). In areas of concurrent regulation, the local regulation is permissible only to the extent that there is no impairment of the national interest in the matter (Matter of Presnell v. Leslie, 3 N Y 2d 384; Matter of Braier, 305 N. Y. 148, cert. den. sub nom. Kalmane v. Green, 346 U. S. 802; United States v. Mayo, 47 F. Supp. 552 [D. C., Fla.], affd. 319 U. S. 441). Where, as here, compliance with both regulatory schemes would impair efforts to carry out the Federal interest, the State statutes are superseded to the extent that both regulatory schemes are inconsistent (Quaker Oats CXo. v. City of New York, 295 N. Y. 527, 534, affd. sub nom. Hill Packing Co. v. City of New York, 331 U. S. 787; Public Serv. Comm. v. New York Cent. R. R. Co., 193 App Div. 615, affd. 230 N. Y. 149; United States v. Mayo, supra; see 16 Am. Jur. 2d, Constitutional Law, § 207, and cases cited).
Accordingly, assuming that an exemption from the competitive bid requirements cannot be read into the State statute, the court finds that sections 151 of the Public Housing Law and 103 of the Central Municipal Law are violative of the Supremacy Clause and must yield to HUD regulations, but only to the extent that said regulations apply to a pure “ turnkey ” project. The cited provisions are viable for all other purposes. Furthermore, neither section 103-e of the General Municipal Law nor section 340 of the General Business Law conflicts with HUD regulations and remain applicable even in pure ‘ ‘ turnkey ’ ’ cases.
BEMAINING CONSTITUTIONAL CLAUSES
(a) Location of Project
Petitioners argue that the zoning changes enacted by the town to enable construction of the project in the vicinity of their prop *61 erty constitutes illegal spot zoning.[4] ******That the argument is devoid of merit is implicit in the Appellate Division’s opinion concerning the validity of the special permit issued for the very site now brought into question (Matter of Farrelly v. Town of Ramapo, 35 A D 2d 957, supra). Furthermore, it has been held that zoning amendments designed to permit construction of low-income housing do not offend this State’s Constitution (Borek v. Golder, 190 Misc. 366, 389, supra) nor does it constitute impermissible “contract zoning” (Chase v. City of Glen Cove, 34 Misc 2d 810; Anderson, Zoning Law and Practice in New York State, § 8.14; 1 Anderson, American Law of Zoning, § 8.21; 67 N. Y. Jur., Zoning and Planning Laws, § 146).
(b) Equal Protection
Petitioners’ further argument that the project, being based on age and income classification, amounts to a denial of the equal protection clause is singularly unimpressive in logic or authority.
It has been held that a denial of equal protection occurs where there exists a systematic pattern of discrimination between classes of persons with no rational basis for differentiation (Matter of Posner v. Rockefeller, 31 A D 2d 352, 353, affd. 25 N Y 2d 720). On the other hand, there is no denial of equal protection if a reasonable relationship supports the classification and the purpose to be achieved (McGowan v. Maryland, 366 U. S. 420; Allied Stores of Ohio v. Bowers, 358 U. S. 522; Matter of Bauch v. City of New York, 21 N Y 2d 599, 606-607, cert. den. 393 U. S. 834). As our Court of Appeals recently stated: ‘11 Equal protection does not require that all persons be dealt with identically, but it does require that a distinction made have some relevance to the purpose for which the classification is made. ’ [Citing case.] Nor is the Constitution offended if the classification has some reasonable or rational basis. [Citing cases.] Furthermore, ‘ [a] statutory discrimination will not be set aside if any state of facts reasonably may be conceived to justify it’ [Citing case] ” (People v. Ditniak, 28 N Y 2d 74, 78).
Classifications predicated upon natural factors such as age and income have long been recognized as permissible in many legislative forms such as the social security, income tax, housing, welfare, labor, motor vehicle laws, selective service require *62 ments, voting franchise requisites, etc. (see 16A C. J. S., Constitutional Law, §§ 491, 498). Consequently, differentiation based upon age and income factors is permissible as long as it is rational and does not result in invidious discrimination (Dandridge v. Williams, 397 U. S. 471; Shapiro v. Thompson, 394 U. S. 618). Classification does1 not offend the Constitution ‘‘ merely because it is not made with mathematical nicety or because in practice it results in some inequality ’ ’ (Lindsley v. National Carbonic Gas Co., 220 U. S. 61, 78).
While it is the public policy of this State to assure every individual an equal opportunity to decent housing (Center Mgt. Co. v. State Division of Human Rights, 34 A D 2d 637, affd. 27 N Y 2d 914), it has been recognized that “providing low rental housing for persons with low income is a State concern ’ ’ (Matter of Fuller v. Urstadt, 28 N Y 2d 315, 318). The ends of this salutory policy may be achieved by the means employed herein, to wit: the construction of low-income housing for the poor and elderly; else how would these persons otherwise secure decent housing (see Parrino v. Lindsay, 66 Misc 2d 342 [upholding the constitutionality of limited class legislation which exempts designated senior citizens from rent increases in rent controlled apartments in New York City]; see, also, the Mitchell-Lama Act [L. 1961, ch. 803; Private Housing Finance Law, §§ 10-37] which is primarily designed to benefit lower to middle-income persons). Moreover, limited class legislation in the housing area has passed constitutional muster in this State (People ex rel. Durham Realty Corp. v. La Fetra, 230 N. Y. 429, 447) and the constitutional issues raised herein are foreclosed by decisions in this State (Matter of Murray v. La Guardia, 291 N. Y. 320, cert. den. 321 U. S. 771; Matter of New York City Housing Auth. v. Muller, 270 N. Y. 333, 342; Borek v. Golder, 190 Misc. 366, supra, Davidson v. City of Elmira, 180 Misc. 1052, affd. 267 App. Div. 797, mot. for lv. to app. den. 292 N. Y. 723; see 19 N. Y. Jur., Eminent Domain, § 33), determinations of the Supreme Court (Thorpe v. Housing Auth., 393 U. S. 268; supra, Berman v. Parker, 348 U. S. 26; Cleveland v. United States, 323 U. S. 329) and kindred adjudications in other jurisdictions (see Ann. 172 A. L. R. 966, 971, Housing and Slum-Clearance Laws and Ann. 130 A. L. R. 1069, 1079, 16A C. J. S., Constitutional Law, § 498, N. 38; Note, Low-Income Housing and the Equal Protection Clause, 56 Cornell L. Rev. 343 [1971]). These decisions hold, in essence, that the acquisition of land for low-income housing is for public purposes and does not violate the Constitution. It follows, therefore, that the construction of a low-income project is *63 afforded the same shield against constitutional attack. Indeed, there is no denial of equal protection in the internal classification of the tenants for administrative purposes (Hammond v. Hous. Auth. 39 L. W. 2579 [D. C., Ore., decided April 2, 1971]). Moreover, the fact that a private developer may reap a profit is totally without significance, ‘ ‘ if, upon completion of the project the public good is enhanced” (Matter of Murray v. La Guardia, 291 N. Y. 320, 329-330, supra, see Canata v. City of New York, 11 N Y 2d 210, app. dsmd. 371 U. S. 4; Amalgamated Housing Corp. v. Kelly, 193 Misc. 961).
Accordingly, the court finds that the within classification is rational, adheres to established precedent, is in furtherance of the statutory and constitutional public policy of this State, promotes the Federal housing policy, does not constitute invidious discrimination and is not violative of the equal protection clause. Petitioners’ complaint, which in reality relates to the existence of the project in their community (Fletcher v. Romney, 323 F. Supp. 189, supra), is more properly addressed to the Legislature rather than to the courts (James v. Valtierra, 402 U. S. 137, supra).
SUMMARY
To recapitulate briefly, the court has made the following determinations: (1) petitioners have standing to sue; (2) the Statute of Limitations is not a viable defense; (3) New York’s competitive bid legislation, specifically sections 151 of the Public Housing Law and 103 of the General Municipal Law, does not apply to a pure “turnkey” project; (4) assuming, arguendo, that said statutes do apply, they necessarily conflict with Federal policy and are pre-empted under the supremacy clause of the Federal Constitution; (5) the zoning changes designed to permit construction of low-income dwellings are valid; and (6) insofar as the zoning amendments create limited classifications based on age and income, they are constitutional.
In closing, the court wishes to note its appreciation to counsel for all parties for the manner in which they presented their views, both orally and by well-constructed briefs.
In view of the above rulings the petition is denied and the proceeding is dismissed.
APPENDIX
"FEDERAL LEGISLATION
In the Federal sector Congress amended the landmark 1937 legislation by passing the Housing Act of 1949 (H. S. Code, tit. *64 42, § 1441 et seq.) and the Housing and Urban Development Act of 1968 (U. S. Code, tit. 42, § 1441a et seq.; 82 U. S. Stat. 476). The cited provisions contain the Congressional declaration of purpose and reaffirmation of national housing goals that every American shall have a decent place of abode. As recently as December, 1970 Congress again confirmed its commitment to Federal sponsorship of low-income housing through authorization of additional governmental loan guarantees (Public Law 91-609).
PROPOSED NEW YORK LEGISLATION AND RECENT DEVELOPMENTS
In line with the Federal changes in housing policies, the delegates to the 1967 State Constitutional Convention proposed a repeal of article XVIII and the enactment of a more flexible provision entitled “economic and community development” (Constitutional Convention of 1967, vol. 12 [proposed art. X]). Despite rejection of the proposed constitution by the voters the essential proposals embodied in the afore-mentioned Community Development article have been passed by the 1970 Legislature (McKinney’s 1970 Session Laws at LXXXV-VII), by the 1971 Legislature, and will be submitted to the voters as a constitutional amendment. Since the ‘ ‘ turnkey ’ ’ concept was in its embryonic stage while the Convention committee documents were being prepared, specific mention of that program is absent. Significantly, however, the reports upon which the new housing article is predicated clearly reveal legislative awareness of the need to adopt more flexible housing and fiscal provisions to enable this State to obtain additional Federal assistance in the public housing area (see Report of the Temporary State Commission, supra, pp. 24-25). Support for this view is found in the Urban Development Corporation Act of 1968 which creates a new State agency to provide low-income housing in municipalities where the need exists regardless of restrictive zoning patterns (L. 1968, ch. 174; see Davidoff & Davidoff, “Opening the Suburbs ”, 22 Syracuse L. Rev. 509. 525-27 [1971]).
THE ‘ ‘ TURNKEY ’ ’ PROGRAM
The ‘ ‘ turnkey ’ ’ concept first entered the public housing field in 1966 and has since become a prime Federal procedure for the expeditious development of quality low-income housing (Burstein, “New Techniques in Public Housing”, 32 Law & Contemp. Prob. 528, 530-34 [1967]). Congress has gone on record in favor of the ‘1 turnkey ’ ’ method and in legislative memoranda accompanying passage of the Housing and Urban *65 Development Act of 1968 set forth the reasons in support of the novel financing mechanism (Conference Report [H. R. 17989] to P. L. 90-448, 2 TJ. S. Code & Adm. News,. 90th Cong., 2d Sess. 1968 at 2899): “ Major emphasis * * * will he placed on production under the turnkey method * * *
“ The turnkey method, with its emphasis on the involvement of private enterprise in the production of public housing, has substantially expanded the productive capability of the public housing program. Under this method private developers who own, or have an option to buy land or improved property can contract to build housing on the land, or rehabilitate the property, for eventual sale to a local housing agency. This is the reverse of the standard method under which the housing agency first acquires property by purchase or eminent domain, has the construction plans and specifications prepared by its own architects, and then has the construction done by general contractors.
“ Under turnkey, a low-rent project can be constructed in less than half the time required for public housing. It frees the builder from complicated and cumbersome procedures and stimulates his initiative to develop imaginative and well-designed buildings at a lower cost ” (emphasis added).
ENLISTMENT OF PRIVATE ENTERPRISE AND FEDERAL-STATE CO-OPERATION
Originally the Federal Housing Act of 1937 was primarily designed to provide for Federal subsidies of government-operated low-income housing (Favors v. Randall, 40 F. Supp. 743, 744 [D. C., Pa.]). However, the 1968 amendments focus upon the enlistment and participation of private enterprise in the construction of public housing, which purposes are consistent with this State’s attempt to attract diverse entrepreneurs into the public housing sector (see, e.g., Private Housing Finance Law, § 11; § 11-a, subd. 5; § 41, subd. 2; Public Housing Law, § 76-a). New York has gone further and has authorized local housing authorities to do “ any and all things necessary to secure the financial aid ” of the Federal housing agency (Public Housing Law, § 220; see N. Y. Const., art. XVIII, § 2). Furthermore, paragraph (i) of subdivision 1 of section 37 of the Public Housing Law was amended in 1968 to permit authorities to enter into co-operation agreements with the Federal Government so as to obtain Federal assistance for low-income projects (see, also, Public Housing Law, § 37, subd. 1, par. [m]; L. 1968, ch. 858, §§ 2, 5).

. The surveys and investigation conducted by the committee apparently were funded by means of a loan agreement between the Housing Authority and the Federal Department of Housing and Urban Development. (See Code of Fed. Reg., tit. 24, § 52.1 et seq.)

. The parties refer to the actual number of respective bidders. However, two potential developers submitted two bids each and another developer submitted three bids. Accordingly, a total of 10 proposals was received by the board ranging in price from approximately one million to six million dollars. Acreage varied from 1% to 26 acres; and the number of units proposed for construction ranged from 50 to 300.

. Petitioners are primarily concerned about subdivisions 1 and 5 of section 151 of the Public Housing Law. Nonetheless, as to subdivision 1 a form of competitive bidding did transpire in the only manner possible under the turnkey program (see n. 2). Consequently, the salutary objectives of our competitive bid legislation: to guard against fraud, waste, extravagance, etc., seemingly are achieved and petitioners do not contend otherwise; rather they insist on strict compliance with State procedural prerequisites which have no relevancy to the policies to be vindicated.

. The contention is not readily definable, but, if it relates to the power of the municipality to enact the changes in question, petitioners seemingly are foreclosed by the Farrelly determination. Furthermore, the municipality has statutory authority to effect such zoning changes (Town Law, §§ 261, 263, 272-a); and express authority to do so to obtain a State-sponsored project (Public Housing Law, §§ 71, 99). Similarly, the Federal agency will not release funds until the municipality does all things necessary to effectuate the project (U. S. Code, tit. 42, § 1407, subds. [a] and [b]).